Charles W. BOWEN, Jr., d/b/a Suburbia News Delivery Service, et al., Plaintiffs-Appellees,

v.

NEW YORK NEWS, INC., et al., Defendants-Appellants.

Nos. 423, 424, 425, Dockets 73–2648, 73–2668, 74–1257.

United States Court of Appeals, Second Circuit.

Argued March 12, 1975.

Decided July 23, 1975.

W. P. Hindman, Jr., New York City (Townley, Updike, Carter & Rodgers, New York City, of counsel), for defendants-appellants New York News, Inc., Jack Underwood, Robert O'Sullivan, Anthony Catanzaro, David Auerbach, Donald A. Nizen, Gabriel Lewander, F. M. Flynn, Winfred James, John Erwin, also known as John Irwin, Sy Hecht, Ernest Smith, Joseph Conway, P. Pastorelli, J. Pastorelli, Bernard F. Smith, Howard Kent, E. DeBella, Mrs. Arthur C. Ellerman, Raymond Ledda, Arnold Blume, Waldo Rodriguez, E. Capazzi, Ronald Parkhurst, W. Joubert, C. McNally, J. Raben, Charles Ashdown, J. Occhino, R. Carroll, B. Smith, and "John" Reilly (whose first name is presently unknown).

Nicholas L. Coch, New York City, for defendants-appellants Lepore.

Herbert Monte Levy, New York City, for plaintiffs-appellees.

Before MOORE, FEINBERG and MANSFIELD, Circuit Judges.

MANSFIELD, Circuit Judge:

This action was brought in the Southern District of New York by 30 independent home newspaper delivery dealers against New York News, Inc. ("The News" herein), publisher of The Daily News and The Sunday News ("News" herein), various employees of The News and franchise dealers of the News, seeking injunctive relief and damages under §§ 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26.[1]

---

1. Sections 4 and 16 of the Clayton Act provide in pertinent part:

 "§ 15. *Suits by persons injured; amount of recovery*

 "Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United

Plaintiffs alleged that The News and its franchise dealers engaged in a conspiracy in restraint of trade in violation of § 1 of the Sherman Act, 15 U.S.C. § 1, when, in early 1966, the News established in certain parts of Long Island a system of home newspaper delivery whereby dealers with the aid of carrier boys would distribute only the News in exclusively assigned territories. These franchise dealers, distributing through carrier boys, sold the newspapers at prices fixed by The News. Prior to institution of this system, the News had been delivered in many areas by the plaintiffs as independent "route dealers," and by adult carriers who handled various other publications and delivered them primarily by motor vehicle. Following introduction of the franchise dealer system, The News ceased selling newspapers to most competing independent route dealers.

The trial judge, after a lengthy trial, rejected a defense that the agreement's provision for stipulated resale prices was protected from antitrust attack by the federal Fair Trade law, 15 U.S.C. § 45(a)(2) (the McGuire Act) and by New York's Feld-Crawford Act, N.Y. Gen.Bus.L. McKinney's Consol.Laws, c. 20, § 369–a et seq., holding that the agreements constituted an illegal conspiracy to fix prices. He further found that The News' refusal to deal with the plaintiffs, and certain actions taken by The News and its franchise dealers to restrict or prevent access by independent route dealers to copies of The Daily News, were taken pursuant to the illegal resale price conspiracy, and that the latter activities also constituted a conspiracy to monopolize intrabrand competition in the home delivery market of the News. See 366 F.Supp. 651 (S.D.N.Y. 1973)[2] Since we hold that the Fair

---

States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee." 15 U.S.C. § 15.

"§ 26. *Injunctive relief for private parties; exception*

"Any person, firm, corporation, or association shall be entitled to sue for and have injunctive relief, in any court of the United States having jurisdiction over the parties, against threatened loss or damage by a violation of the antitrust laws, including sections 13, 14, 18, and 19 of this title, when and under the same conditions and principles as injunctive relief against threatened conduct that will cause loss or damage is granted by courts of equity, under the rules governing such proceedings, and upon the execution of proper bond against damages for an injunction improvidently granted and a showing that the danger of irreparable loss or damage is immediate, a preliminary injunction may issue: *Provided*, That nothing herein contained shall be construed to entitle any person, firm, corporation, or association, except the United States, to bring suit in equity for injunctive relief against any common carrier subject to the provisions of the Act to regulate commerce, approved February fourth, eighteen hundred and eighty-seven, in respect of any matter subject to the regulation, supervision, or other jurisdiction of the Interstate Commerce Commission." 15 U.S.C. § 26.

2. Judge Bauman rejected plaintiffs' contention that the agreement between The News and its franchise dealers to the effect that the dealers would handle only the News violates § 3 of the Clayton Act, 15 U.S.C. § 14, on the ground that plaintiffs had no standing to challenge this provision. See p. 5053, *infra*. Plaintiffs do not appeal this determination.

The trial judge further rejected a claim by plaintiffs that The News violated § 2 of the Clayton Act, as amended by the Robinson-Patman Act, 15 U.S.C. § 13, by selling wholesale copies of The News to the franchise dealers at rates preferential to those offered to the independent route dealers. Plaintiffs' appeal of this determination does not merit discussion since it is clear, as Judge Bauman held, 366 F.Supp. at 680–81 & n. 69, that plaintiffs never alleged or proved the jurisdictional requirement of § 2 that "either or any of the purchases involved in such discrimination [be] in commerce," a requirement which has been interpreted to mean that "§ 2(a) applies only where 'at least one of the two transactions which, when compared, generate a discrimination . . . [that] cross[es] a state line'" *Gulf Oil Corp. v. Copp Paving Co.,* 419 U.S. 186, 200, 95 S.Ct. 392, 401, 42 L.Ed.2d 378 (1974), *quoting Hiram Walker, Inc. v. A & S Tropical, Inc.,* 407 F.2d 4, 9 (5th Cir.), *cert. denied,* 396 U.S. 901, 90 S.Ct. 212, 24 L.Ed.2d 177 (1969); see *Littlejohn v. Shell Oil Co.,* 483 F.2d 1140, 1144 (5th Cir.) (en banc), *cert. denied,* 414 U.S. 1116, 94 S.Ct. 849, 38 L.Ed.2d 743 (1973); *Willard Dairy Corp. v. National Dairy Prods. Corp.,* 309 F.2d 943, 946 (6th Cir. 1962), *cert.*

Trade laws did protect the stipulated price agreements between The News and its franchise dealers we reverse Judge Bauman's finding of an illegal conspiracy to fix prices.[3] We affirm, however, his finding of a conspiracy to restrain trade by restricting access of independent dealers to copies of the News, modify the award of injunctive relief as hereafter stated, and remand for determination of damages pursuant to the agreement of the parties that this determination would await a finding of liability.

The adoption of the system of home delivery by franchise dealers, the legality of which is at issue, was prompted by a decline in distribution in the early 1960's suffered by The News, which by the time of this lawsuit had the largest circulation of any newspaper in the United States. This decline was largely attributable to a decline in sales of an evening edition published by The News, and by the pronounced shift in population and in commercial enterprises, which led to a shift of advertising markets from city to suburbs. Unfortunately for The News, its efforts to compete in this suburban market met with limited success. Despite initiation of specialized suburban zone sections, which carried regional advertising and local news, between 1960 and 1966 the circulation of the home-delivered News in Nassau and Suffolk Counties (suburban Long Island) increased by less than 2,400 copies, failing to keep up with dramatic population gains in the area of about 350,000 persons and equally dramatic increases in the circulation in the Long Island market of The News' major competitors, Newsday and the Long Island Press.

Before 1966 the News was home-delivered on Long Island by the independent route dealers. The route dealers purchased various publications wholesale and resold them to home delivery subscribers within defined territories, the boundaries of which each route dealer respected. The News concluded that use of the independent route dealers was an impediment to its effort to substantially increase circulation of its newspaper in Long Island. After testing in 1965, The News determined to change its mode of home distribution in some parts of New York City and much of Long Island to the system of franchise dealers and carrier boys. The dealers who participated in this program signed "Carrier Agreements" with The News which generally provided that the dealer would be assigned an exclusive territory, that he would deliver only the News, and that the prices charged to customers and to carrier boys engaged in delivery would not exceed maximum prices set by The News.

On initiation of the new program late in 1965 and early in 1966, The News offered to some of the plaintiff independent route dealers the opportunity to become franchise dealers. They were advised that franchise dealers would handle home delivery of the News within their territories on an exclusive basis, and that if the independent route dealers did not agree to the franchise contract, supplies of the News to them would be terminated. While some independent route dealers did choose to become News franchise dealers, none of the plaintiffs did so and 16 of the plaintiffs were thereafter cut off. Meanwhile, The News filled out its franchise dealer ranks from other sources, and subsidized the early stages of the organization of franchise dealerships.

Terminated independent route dealers did not cease in their efforts to service their customers with copies of the News

---

*denied,* 373 U.S. 934, 83 S.Ct. 1554, 10 L.Ed.2d 691 (1963); *Central Ice Cream Co. v. Golden Rod Ice Cream Co.,* 287 F.2d 265, 267 (7th Cir. 1961).

**3.** In view of the fact that on May 5, 1975, the Governor of New York signed into law a bill repealing New York's Feld-Crawford Act it may be argued that our decision has been mooted, requiring affirmance of the injunctive relief granted by the district court. The state's action may well lead The News to reconsider its marketing and distribution system. However, the repeal does not become effective until August 5, 1975, and there remains the claim for damages, which turns upon the legality of The News' pre-repeal conduct.

even though they could no longer obtain the newspapers directly from the publisher. They sought to purchase copies from other newsdealers and local outlets, but met .substantial difficulty in finding anyone who would sell to them on a continuing basis. Many plaintiffs thus had to travel long distances to obtain copies of the News, usually to Brooklyn or Queens, and were forced to pay close to home delivery price. Even then, many route dealers had difficulty obtaining sufficient copies to service their customers, and could obtain only early editions and editions which did not contain the local Long Island news section.

In addition, the trial court found on evidence hotly disputed by appellants that employees of The News engaged with the franchise dealers in a campaign of surveillance and harassment to root out and eliminate the sources of supply of the competing independent route dealers. The trial judge found that some retail dealers who sold to the route dealers were threatened with termination, and in at least one instance were cut off by The News.

I. *Application of the Fair Trade Laws to the Franchise Agreements*

■ The district court's opinion relies heavily upon the conclusion that the agreements between the franchise dealers and The News amounted to an illegal conspiracy to fix maximum resale prices. There is no doubt that this agreement would be per se illegal under § 1 of the Sherman Act unless protected by the Fair Trade laws, *Albrecht v. Herald Co.,* 390 U.S. 145, 88 S.Ct. 869, 19 L.Ed.2d 998 (1968); *Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, Inc.,* 340 U.S. 211, 71 S.Ct. 259, 95 L.Ed. 219 (1951); *Dr. Miles Medical Co. v. John D. Park & Sons Co.,* 220 U.S. 373, 31 S.Ct. 376, 55 L.Ed. 502 (1911). The "Carrier Agreement" clearly states that "the parties desire to avail themselves of the fair trade acts now and hereafter in effect." The issue is whether they succeeded.

In amending the Sherman Act § 1, the Miller-Tydings Act of 1937, 50 Stat. 693 (1937), provided that vertical contracts requiring resale price maintenance would be lawful in states which permitted such contracts, 15 U.S.C. § 1. Following the Court's decision in *Schwegmann Bros. v. Calvert Distillers Corp.,* 341 U.S. 384, 71 S.Ct. 745, 95 L.Ed. 1035 (1951), which held that the Miller-Tydings Act did not permit enforcement of a resale price maintenance contract against nonsigning retailers, Congress passed the McGuire Act, 66 Stat. 631 (1952), amending § 5(a) of the Federal Trade Commission Act, 15 U.S.C. § 45(a), by adding language making clear that if the state statutory scheme permitted enforcement of resale price maintenance agreements against nonsigners these contracts and their enforcement would not constitute violations of the antitrust laws.[4] The

4. 15 U.S.C. § 45(a) provides in pertinent part:

"(2) Nothing contained in this section or in any of the Antitrust Acts shall render unlawful any contracts or agreements prescribing minimum or stipulated prices, or requiring a vendee to enter into contracts or agreements prescribing minimum or stipulated prices, for the resale of a commodity which bears, or the label or container of which bears, the trade-mark, brand, or name of the producer or distributor of such commodity and which is in free and open competition with commodities of the same general class produced or distributed by others, when contracts or agreements of that description are lawful as applied to intrastate transactions under any statute, law, or public policy now or hereafter in effect in any State, Territory, or the District of Columbia in which such resale is to be made, or to which the commodity is to be transported for such resale.

"(3) Nothing contained in this section or in any of the Antitrust Acts shall render unlawful the exercise or the enforcement of any right or right of action created by any statute, law, or public policy now or hereafter in effect in any State, Territory, or the District of Columbia, which in substance provides that willfully and knowingly advertising, offering for sale, or selling any commodity at less than the price or prices prescribed in such contracts or agreements whether the person so advertising, offering for sale, or selling is or is not a party to such a contract or agreement, is unfair com-

McGuire Act, like the Miller-Tydings Act before it, see 15 U.S.C. § 1, made clear that it intended to permit only vertical and not horizontal price maintenance agreements, see 15 U.S.C. § 45(a)(5).[5]

Since the McGuire Act protects only those resale price maintenance contracts which are lawful under state law, Judge Bauman properly began analysis of the Fair Trade problems here by determining whether the contracts complied with New York's Feld-Crawford Act, N.Y. Gen.Bus.L. § 369–a *et seq.* Paralleling much of the federal law, see note 4, *supra,* the New York statute provides in part that

"No contract relating to the sale or resale of a commodity which bears, or the label or content of which bears, the trade mark, brand, or name of the producer or owner of such commodity and which is in fair and open competition with commodities of the same general class produced by others shall be deemed in violation of any law of the state of New York by reason of any of the following provisions which may be contained in such contracts:

(a) That the buyer will not resell such commodity except at the price stipulated by the vendor;

(b) That the vendee or producer require any dealer to whom he may resell such commodity to agree that he will not, in turn, resell except at the price stipulated by such vendor or by such vendee."

The Carrier Agreement between The News and its franchise dealers provides that the franchise dealer will "supervise and direct the delivery and resale of copies of the Daily and Sunday News to . . . regular subscribers in his territory at no more than the regular established home delivery price." Plaintiffs first challenge this agreement on the grounds that the News is not in free and open competition with commodities of the same general class, and that The News' purported control over the resale price also includes control of the service charge for home delivery.

We agree with the trial judge, for the reasons stated in his opinion, that the News is in free and open competition with other metropolitan and local newspapers and that the provision as to delivery service does not limit The News' ability to control resale price, 366 F.Supp. at 661–62. Similarly, we agree with his conclusion that the Feld-Crawford and McGuire Acts authorize the setting of maximum resale prices, and not merely minimum or fixed prices as plaintiffs urge. See 366 F.Supp. at 663–64. Section 369–a(1) of the Feld-Crawford Act refers only to "stipulated" prices while the McGuire Act refers to "minimum or stipulated" prices. 15 U.S.C. § 45(a)(2). It has been held in New York that the term "stipulated" contemplates an agreement "by which the buyer agrees not to sell below a stated price as well as . . . a contract by which the buyer agrees to sell neither above nor below that price . . . ." *General Electric Co. v. S. Klein-on-the-Square, Inc.,* 121 N.Y.S.2d 37, 47 (Sup.Ct.1953). In setting a lower bound the manufacturer exercises only part of his authority to prevent sales below the minimum designated price. See *Mead Johnson & Co. v. West Chester Discount, Health & Vitamin Center, Inc.,* 212 F.Supp. 310, 313 (E.D.Pa.1962). No reason exists why the manufacturer similarly may not exercise only the other half of his power and restrict only maximum resale prices. See also *Schwegmann Bros. v. Calvert Distillers Corp., supra,* 341 U.S. at 388, 71 S.Ct. 745. Indeed, although horizontal restraints on maximum prices are illegal per se, *Albrecht v. Herald Co., supra,* limitations on maximum resale prices are less restrictive of competition

petition and is actionable at the suit of any person damaged thereby.

"(4) Neither the making of contracts or agreements as described in paragraph (2) of this subsection, nor the exercise or enforcement of any right or right of action as de-

scribed in paragraph (3) of this subsection shall constitute an unlawful burden or restraint upon, or interference with, commerce."

5. See p. 1250, *infra.*

than minimum price restraints, *id.* 390 U.S. at 159, 88 S.Ct. 869 (Harlan, *J.,* dissenting). Since Congress and the New York legislature determined to permit the more restrictive vertical minimum price restraints, no straining is necessary to conclude that maximum resale prices are also permissible.

■ Plaintiffs' final contention is that the franchise agreement is unprotected by the McGuire Act because it is an agreement "between wholesalers," precluded from antitrust immunity by paragraph (a)(5) of that statute which provides:

> "Nothing contained in paragraph (2) of this subsection [legalizing agreements prescribing stipulated resale prices, see note 4, *supra*] shall make lawful contracts or agreements providing for the establishment or maintenance of minimum or stipulated resale prices on any commodity referred to in paragraph (2) of this subsection, between manufacturers, or between producers, or between wholesalers, or between brokers, or between factors, or between retailers, or between persons, firms, or corporations in competition with each other." 15 U.S.C. § 45(a)(5).

The Feld-Crawford Act similarly specifies that "[t]his article shall not apply to any contract or agreement between producers or between wholesalers or between retailers as to sale or resale prices." N.Y.Gen.Bus.L. § 369–c. Paragraph 5 of the McGuire Act was construed by the Supreme Court in *United States v. McKesson & Robbins, Inc.,* 351 U.S. 305, 76 S.Ct. 937, 100 L.Ed. 1209 (1956), to bar an antitrust exemption for a drug manufacturer which conducted a major wholesale operation and which entered Fair Trade agreements relating to its drug products with independent wholesalers who were competitors of its wholesale operation. The Court held that the agreements were contracts "between wholesalers," refusing to accept an argument that McKesson acted "only as a manufacturer" in entering into them. 351 U.S. at 312, 79 S.Ct. 937. In *Janel Sales Corp. v. Lanvin Parfums,*

*Inc.,* 396 F.2d 398 (2d Cir.), *cert. denied,* 393 U.S. 938, 89 S.Ct. 303, 21 L.Ed.2d 275 (1968), we applied *McKesson* to prohibit enforcement by a perfume manufacturer of a resale price maintenance agreement against a perfume retailer where the evidence indicated that the manufacturer was also engaged in retail operations, holding that the contract was prohibited as one "between retailers" even though there was no showing that the retailers were in actual competition with each other. 396 F.2d at 403. It plainly follows from this analysis that an agreement "between wholesalers" would also be illegal despite the absence of actual competition between the parties.

■ The key question before us, therefore, is whether the agreement between The News and the franchise dealers was one "between wholesalers." The trial judge found that The News is a "wholesaler," since its business is selling in gross to various retail dealers and independent wholesalers, and that the franchise dealers are also "wholesalers" because they resell in bulk to their carrier boys, whom the judge considered to be "retailers." The analytical foundation of the district court's judgment lies in this latter finding, i. e., that the "franchise dealers also function as wholesalers in selling to their carrier boys." 366 F.Supp. at 666. We hold this conclusion to be erroneous.

It is true that the language used in The News' Carrier Agreements lends facial support to the view that the franchise dealer was to act as an intermediate purchaser, buying from The News and reselling to carrier boys, who would then make the ultimate resales to home subscribers. For instance, the Agreement refers to "resale" by the delivery boy of papers and provides that the franchise dealer may not "charge" the boy more than a fixed "wholesale rate." Indeed, The News, apparently ignorant of the significance of *McKesson,* also sought to invoke the McGuire Act by continuing to describe itself as selling to the franchise dealers as "wholesalers" for resale to the delivery boys, and its

witnesses appear to have accepted this characterization of affairs. Thus The News' Circulation Director testified that the agreements enabled The News to "fix[ ] the price at which the boy sells to the ultimate consumer and . . . fix[ ] the price at which the franchised dealer sells to the boy." He further characterized the franchise dealer distribution system: "The News distributes to the franchised dealer, the franchised dealer distributes to the boy, and the boy distributes to the home."

 The characterizations used by parties in their agreements, however, while a factor to be considered, are not binding on the court, which must look to the substance rather than to the parties' formal description of their relationship in determining whether there has been compliance with the McGuire Act. The words "wholesaler" and "retailer," as used in that Act, are to be understood "in their normal and customary [manner]," *United States v. McKesson & Robbins, Inc., supra,* 351 U.S. at 312, 76 S.Ct. at 941, *quoting Schwegmann Bros. v. Calvert Distillers Corp., supra,* 341 U.S. at 388, 71 S.Ct. 745. As we emphasized in *Janel Sales Corp.,* the "customary" meaning of "retailer" requires inquiry into the normal indicia of a retail sale such as "actual size of the sale, the dollar value of the sale, and the number of similar sales that are made," 396 F.2d at 403, and whether or not the purchaser is buying for his own personal needs, *Parke, Davis & Co. v. Janel Sales Corp.,* 328 F.2d 105, 106 (2d Cir.), *cert. denied,* 379 U.S. 835, 85 S.Ct. 67, 13 L.Ed.2d 42 (1964). Similarly, in determining whether a party to a Fair Trade Agreement is a "wholesaler," we must look to whether the franchisee buys for the purpose of reselling in gross and whether the persons to whom he sells actually resell at retail.

 Judged by these standards, the franchise dealer here performs no true "wholesale" functions. Unlike the normal wholesaler, who buys in bulk and distributes to a broad spectrum of independent merchants who then resell for their own profit, here the Carrier Agreement clearly contemplates "sales" only to home subscribers. Although Paragraph (a)(5) of the McGuire Act prohibits Fair Trade agreements between wholesalers, its thrust is the prevention of price fixing between those in competition with sellers at the same functional level. *United States v. McKesson & Robbins, Inc., supra,* 351 U.S. at 313, 76 S.Ct. 937. Even accepting the characterization of the transactions here involved as "resales" by the franchise dealers to the delivery boys, the distribution was *exclusively* through the franchise dealers to the delivery boys, so that The News, however its function is described, would never be engaged in selling directly to delivery boys or to home subscribers and thus would not have any occasion to agree with competing sellers upon the resale price. It would therefore be anomalous to classify as "wholesalers" buyers whose resales are solely to a narrow group of this nature.[6]

Without denigrating the importance of the home-delivery function performed by the 12–15 year old carrier boys, to describe their role as that of "retailers" is to distort and to inflate it beyond its obvious limitations. They are simply boys engaged by the franchise dealer to make deliveries of the News to home subscribers on given routes at a fixed

---

**6.** As noted further on in this opinion, the franchise dealers may not legally be restricted to selling to the carrier boys or to their home subscribers. See p. 1257, *infra.* The Carrier Agreement purports, however, to fix prices only on resales to "regular subscribers in his territory" and to carrier boys, and not on sales to anyone else. The fact that the franchise dealer may be a wholesaler in making sales to other persons therefore does not make the present Fair Trade agreement illegal under Paragraph (a)(5) of the McGuire Act, since the Carrier Agreement does not fix prices on sales by the franchise dealer which may place him in competition with The News, see *Janel Sales Corp. v. Lanvin Parfums, Inc.,* 396 F.2d 398, 404–05 (2d Cir.), *cert. denied,* 393 U.S. 938, 89 S.Ct. 303, 21 L.Ed.2d 275 (1968).

compensation per copy, with no real risk and no chance of realizing independent profits. The selling function, including advertising, sampling and solicitation of prospective home subscribers, is performed almost entirely by The News and by the franchise dealers rather than by the boys. The boys, moreover, are directly under the supervision and management of the franchise dealer; indeed, the agreement does not require the use of carrier boys at all. The boy hardly has a proprietary interest in the subscribers or his route. Rather it is the franchise dealer who is required to prepare and maintain lists of subscribers in his territory and also "the names, addresses and telephone numbers of all *carrier boys, agents, and employees* employed in said territory." Likewise, it is the franchise dealer, not the boys, who is responsible for investigating all complaints and subscription stoppages, filing a report to The News within a week, and who is to be paid at a specified rate for each new home delivery subscription "obtained through the efforts of the Carrier or his agents and employees." Of course, franchise dealers encouraged the carrier boys to obtain new subscriptions, in their route areas, assured them that their efforts would be rewarded by retaining the new subscriptions on their routes, and warned that stop orders on their routes would decrease their income. But this hardly establishes an independent retail function for the boys, since their profits remained limited to the established rate per delivered paper, and ultimate responsibility for subscriptions

lay with the franchise dealer. While the franchise agreement did not specifically remove from the carrier boys the risk of loss should a subscriber fail to pay, the boys did not in fact sell for their own risk and account. There was no evidence that boys had sustained any losses on account of delinquent subscribers. On the contrary, there was evidence that at least one dealer reimbursed his boys after the subscriber failed to pay, hardly an unexpected practice.

■ The News urges us to go further and hold that the franchise dealers were not independent "dealers" at all, but rather its employees or agents engaged to carry out a delivery function. In that event all action taken by The News would be unilateral, and no "conspiracy" could be found.[7] However, we reject the contention that the franchise dealers were mere employees.

Aside from the fact that the Carrier Agreement itself provided "that the Carrier is and shall remain an independent contractor and not an employee or agent of The News," the Carrier, although not a "wholesaler," possesses too many attributes of independence in his relationship to others to be classified as an employee. The Carrier is given sole discretion to hire, discharge and supervise those engaged by him to carry out his delivery function, and sole discretion to determine the manner in which collections and deliveries are to be made. Significantly, the Carrier "will not . . . have the right to return at cost unsold copies of the Daily or Sunday News."[8]

---

**7.** The only basis for finding a violation of the antitrust laws based on the unilateral acts of The News was plaintiffs' assertion of an "attempt to monopolize" by The News. Sherman Act § 2, 15 U.S.C. § 2. The trial judge rejected this claim since there was no showing by the plaintiffs that this alleged attempt, even if successful, would accomplish monopolization or create a dangerous probability of it. 366 F.Supp. at 673–76. *Lorain Journal v. United States*, 342 U.S. 143, 153, 72 S.Ct. 181, 96 L.Ed. 162 (1951); *American Tobacco Co. v. United States*, 328 U.S. 781, 785, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946). Plaintiffs do not appeal this determination, which in any event appears

correct in view of evidence that The News competes with numerous other daily newspapers in the New York City metropolitan area, and that The News in no way threatened to dominate this market.

**8.** The News urges that this clause was meaningless, since the franchise dealer was to buy only enough copies to service the number of home subscribers in his territory, which he knew in advance, and thus he could have "unsold copies" only if he made a mathematical error. Apart from the anomaly of The News urging that a clause of its own contract is essentially surplusage, its argument here is wholly inconsistent with its argument that the

Moreover, the subscribers in a franchise dealer's territory quite clearly "belong" to him. In the event the Carrier Agreement is terminated, the franchise dealer agrees to "offer to The News, the right of first refusal to purchase his subscription list" at a specified rate. The franchise dealer is entitled to sell this list to another person in the event The News declines this offer. In view of these contractual arrangements, The News' assertion that it, and not the franchise dealer, maintained the actual subscriber lists and could unilaterally remove subscribers from a dealer's territory if the dealer was compensated therefor, are entitled to little weight. The record clearly supports the district court's conclusion that, when papers were sold to the franchise dealer, The News was dealing with an independent operator.[9]

In summary, we are persuaded that, although the franchise dealers occupy a position of some independence in the distribution of the News and the parties characterized the distribution as a "sale" of the News to the dealers and by the dealer to the carrier boy, the district court erred in holding that the franchise dealers are "wholesalers" for purposes of the McGuire Act. It was likewise error, in view of all of the circumstances surrounding the employment of the carrier

boys, including their relatively tender age (12 to 15 years), to classify them as "retailers." Despite the agreement's language to the effect that the franchise dealers would sell to the carrier boys at one price and that the boys would "resell" to subscribers at a higher price, the fact is that the delivery boy receives a fixed amount for each paper delivered, a result consistent with the more reasonable view that the dealer is more in the nature of a "carrier" or "distributor," who assumes the obligation "to supply all single copy home subscribers within his territory" and the carrier boy is just what his name implies, a delivery boy whose function is to take the News daily to the home subscribers, for which the boy receives a fixed amount per copy.

In view of this conclusion, we hold that Paragraph (a)(5) of the McGuire Act did not invalidate The News' otherwise valid Fair Trade agreements, and that therefore the agreements to fix home delivery prices did not violate the antitrust laws.[10]

II. *The News' Action in Preventing Plaintiffs from Obtaining Copies of its Paper and in Imposing Territorial and Customer Restrictions Upon its Franchise Dealers*

Our reversal of the district court's finding of a price-fixing conspir-

---

Carrier Agreement does not in fact limit franchise dealers to sales to home subscribers. Whichever position is correct, we must conclude that this clause was intended to cast some risk, although relatively slight, on the franchise dealer.

**9.** In support of its contention that the franchise dealers are not independent contractors but its employees, The News relies upon the National Labor Relations Board's decision to that effect in *News Syndicate Co., Inc.*, 164 N.L.R.B. 422, 65 L.R.R.M. 1104 (1967), where the Board held that the franchise dealers should be treated as a separate bargaining unit. However, that decision was handed down at an early period of the franchise system and with limited evidence of the system's operation. The NLRB, for instance, found that no sales or transfers of franchises had occurred and that no investment was needed by the franchise dealer.

A later opinion by a New York State Department of Labor Unemployment Insurance Referee in *News Syndicate Co., Inc.*, No. 27-

71585, Case No. E–82–68 (1968), however, disagreed with the NLRB's conclusion, concluding that the dealers were not employees after noting that additional proof had disclosed that franchise dealers had a considerable financial interest in their territories, which had been evidenced by sales of franchises for substantial amounts. Furthermore, there is no showing that The News withheld income and Social Security taxes or provided for Workmen's Compensation for its franchise dealers, which would be the usual indicia of an employer-employee relationship. For these reasons we cannot attribute much, if any, weight to the NLRB decision.

**10.** We agree with the trial judge's conclusion that nothing in the Feld-Crawford Act invalidates the arrangement here. See *Eastman Kodak Co. v. Schwartz*, 133 N.Y.S.2d 908 (Sup. Ct.1954); *Gillette Safety Razor Co. v. Green*, 167 Misc. 251, 3 N.Y.S.2d 822 (1938), aff'd., 258 App.Div. 723, 15 N.Y.S.2d 142 (1939).

acy does not end our inquiry, for the court also found (1) that to enforce its price maintenance scheme The News unlawfully refused to deal with plaintiffs and combined with franchise dealers and others to prevent plaintiffs from acquiring copies of the News for resale in competition against the franchise dealers, and (2) that territorial and customer restrictions in the franchise agreement unlawfully restrained trade in violation of § 1 of the Sherman Act. These practices would not gain immunity from antitrust attack by reason of The News' compliance with Fair Trade laws; and for reasons already noted the charge of conspiracy may not be circumvented on the theory that the franchise dealers were merely The News' employees or agents.

■■■■ Turning first to the district court's finding that The News unlawfully refused to deal with plaintiffs, we are governed by a few well-established antitrust principles of general application. A publisher or manufacturer has the right unilaterally to choose the customers with whom he may deal, *United States v. Colgate & Co.*, 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992 (1919).

> "[F]or this purpose [the manufacturer] may 'franchise' certain dealers to whom, alone, he will sell his goods. Cf. *United States v. Colgate & Co.*, 250 U.S. 300 [39 S.Ct. 465, 63 L.Ed. 992] (1919). If the restraint stops at that point—if nothing more is involved than vertical 'confinement' of the manufacturer's own sales of the merchandise to selected dealers, and if competitive products are readily available to others, the restriction, on these facts alone, would not violate the Sherman Act." *United States v. Arnold, Schwinn & Co.*, 388 U.S. 365, 376, 87 S.Ct. 1856, 1864, 18 L.Ed.2d 1249 (1967).

Where a manufacturer simply decides on his own to substitute one dealer for another, and cuts off the former dealer, his decision to sell exclusively to a new dealer does not amount to an antitrust "conspiracy" with the latter, *Ark Dental Supply Co. v. Cavitron Corp.*, 461 F.2d 1093 (3d Cir. 1972); *Anaya v. Las Cruces Sun News*, 455 F.2d 670 (10th Cir. 1972); *Joseph E. Seagram & Sons, Inc. v. Hawaiian Oke & Liquors, Ltd.*, 416 F.2d 71 (9th Cir. 1969), *cert. denied*, 396 U.S. 1062, 90 S.Ct. 752, 24 L.Ed.2d 755 (1970), even though the manufacturer has agreed with the new dealer to transfer patronage to him and to terminate sales to the former dealer, *Ark Dental Supply Co. v. Cavitron Corp., supra; Anaya v. Las Cruces Sun News, supra*. However, a manufacturer or publisher may not enforce his announced resale prices by active coercion of those who purchase for resale, such as through threats of termination for noncompliance, whether made in combination with others, *Albrecht v. Herald Co., supra; United States v. Parke, Davis & Co.*, 362 U.S. 29, 80 S.Ct. 503, 4 L.Ed.2d 505 (1960), or alone, *Simpson v. Union Oil Co.*, 377 U.S. 13, 84 S.Ct. 1051, 12 L.Ed.2d 98 (1964).

■■■ In the present case The News invited many of the plaintiffs to abandon their independent routes and become its exclusive franchise dealers, advising them that if they chose not to do so The News would find and arrange for distribution through other franchise dealers, which would result in its termination of sales of the News directly to independent route dealers such as plaintiffs. Some independent route dealers accepted The News' offer. Some of the plaintiffs declined the offer and were terminated. The record, however, does not support a finding that the purpose or effect of The News' solicitation was to coerce the plaintiffs into abandoning their distribution of competing newspapers. The News, on the contrary, adduced testimony that its purpose was simply to offer to the independent route dealers, experienced distributors with whom it had long dealt, the first opportunity to participate in The News' new dealership program, if they chose. If they accepted, it was anticipated that they would sell their independent routes to others, not that they would deprive competing papers of an outlet. Thus the record does not support

application of § 3 of the Clayton Act, 15 U.S.C. § 14, which outlaws a contract for sale "on the condition, agreement, or understanding that the lessee or purchaser thereof shall not use or deal in the goods . . . of a competitor or competitors of the lessor or seller" where the effect is to substantially lessen competition or create a monopoly.

The News, however, did not limit itself to the establishment of a franchise dealer system, maximum home delivery prices and substitution of new franchise dealers for independent dealers who chose not to become franchise dealers. In addition, each franchise dealer was limited to a specified exclusive territory and to sales to home subscribers within that territory.[11] Moreover, there was evidence that The News and the franchise dealers cooperated to seek out, by means of surveillance, the source from which independent route dealers were obtaining copies of the News and that The News threatened to terminate those newsdealers and stores who supplied the News to independent route dealers seeking to compete against franchise dealers.

The first question is whether plaintiffs have standing to attack these additional restraints. With respect to The News' assignment of exclusive territories to its franchise dealers, we conclude that as a matter of law, plaintiffs lack standing because they have not asserted antitrust injury to themselves as a result of this practice. This court has held that for an antitrust plaintiff to have standing "[t]here must be a causal connection between an antitrust viola-

tion and an injury sufficient for the trier of fact to establish that the violation was a 'material cause' of or a 'substantial factor' in the occurrence of damage." *Billy Baxter, Inc. v. Coca-Cola Co.*, 431 F.2d 183, 187 (2d Cir. 1970), *cert. denied*, 401 U.S. 923, 91 S.Ct. 877, 27 L.Ed.2d 826 (1971); see *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962); *SCM Corp. v. Radio Corp. of America*, 407 F.2d 166 (2d Cir.), *cert. denied*, 395 U.S. 943, 89 S.Ct. 2014, 23 L.Ed.2d 461 (1969). The district court applied this rule to conclude that no loss suffered by the plaintiffs could be attributed to the clause in the Carrier Agreement requiring the franchise dealers to carry the News exclusively, and dismissed the plaintiffs' claims under § 3 of the Clayton Act, 15 U.S.C. § 14, from which plaintiffs do not appeal. The court reasoned that the exclusive dealing clause could only benefit the plaintiffs, since it excluded the franchise dealers as potential competitors in the sale of newspapers other than the News. We agree.

Similar reasoning applies to the exclusive territory agreement. By virtue of this feature of the Carrier Agreement, the independent route dealers are assured of facing competition from no more than one franchise dealer, who is confined to a certain area. The independent is thus spared the possibility of facing competition from even more sources, and has the option of concentrating his efforts in those territories to which the News has assigned no franchise dealer.[12] The only basis for a claim of injury to plaintiffs from the territorial exclusivity

11. Although the Carrier Agreements do not expressly impose territorial or customer restrictions on the franchise dealer, which has led The News to challenge the district court's findings to the contrary, they impliedly do so. Furthermore, in practice the franchise dealers, except in rare instances, sold only to home subscribers in their respective territories. When a franchise dealer attempted to sell to terminated route dealers or to customers outside of his territory The News took steps to prevent or terminate such sales. See *Lepore v. New York News, Inc.*, 346 F.Supp. 755, 761 (S.D.N.Y.1972).

12. The trial judge did find that prior to The News' introduction of the franchise dealer system each of the route dealers had a defined territory which other dealers, pursuant to "horizontal arrangements of doubtful legality," had respected, thus giving each route a certain degree of exclusivity which made it "more or less valuable and salable." However, the extent to which independents have respected each other's territories since introduction of the franchise system is doubtful.

provision might be that the clause is integral to the functioning of the franchise dealer system and that without it the franchise dealers would drive each other out of business, restoring the independents to their former position as the sole distributors of the News. Such a claim would be entirely too speculative to provide standing. Whatever standing a franchise dealer might have to attack the exclusivity arrangement, cf. *United States v. Arnold, Schwinn & Co., supra,* it is certainly not shared by the independents.

■ Plaintiffs' standing to attack The News' agreement with franchise dealers to restrict the customers to whom they could resell the News and to prevent sales of the News by others to the independents, rests on a different footing. There is evidence that many of the independents, due to these restrictions, were put to considerable expense in obtaining copies of the News for distribution to their customers. They could not in some instances obtain sufficient copies for their customers, and they may have faced some loss of business as a result. This claim of injury is sufficient to give the dealers standing to attack the customer-restriction provisions of the Carrier Agreement.

■ Turning to the merits, we are not here dealing merely with unilateral establishment and enforcement by The News of exclusive territories and customer limitations, which might conceivably be upheld. In addition there was evidence of a joint effort on the part of The News and some franchise dealers to prevent the independents from competing in territories serviced by franchise dealers. The franchise dealers, upon encountering competition from independents who were still able, although with difficulty, to obtain copies of the News, requested The News to deal with the problem and cut off the supply. The News assured the franchise dealers that the sources would be terminated. Toward that objective there was surveillance of some independents and, upon learning their sources, The News retali-

ated against the latter by harassing them, threatening them with termination, or actually terminating their supply. Further, The News instructed its franchise dealers to tell customers in their areas that the independent route dealers were no longer in business and that home delivery could be had only through the franchise dealers. It is true that The News offered evidence to the effect that the surveillance and retaliation were merely isolated incidents, growing out of increasing theft of papers by some route dealers, and that it had little or no anticompetitive effects on plaintiffs. However, the district court's findings are supported by evidence and cannot be set aside as clearly erroneous.

■ The News' conduct, undertaken pursuant to an agreement with the franchise dealers and for the purpose of restricting the access of terminated independents to the News, amounts to an unlawful conspiracy in violation of § 1 of the Sherman Act and is remarkably similar to that condemned by the Supreme Court in *United States v. General Motors Corp.,* 384 U.S. 127, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1966). In that case a number of dealers, each of whom had been franchised by General Motors to sell GM cars in a "location" assigned to the dealer in the Los Angeles area, began reselling cars to "discount houses" who then sold to consumers. Other similarly-franchised General Motors dealers thereupon complained about these practices. General Motors reacted by obtaining agreement from each of its franchise dealers not to sell to the discounters. Three associations of its Los Angeles area franchise dealers undertook jointly to police these agreements, supplying information to General Motors which was used to force non-cooperating dealers to refrain from discount house sales.

General Motors argued that the sales to discounters violated its "location" clause in that new sales outlets were thereby established. The Court did not question the legality of the "location" restrictions in the General Motors franchise agreements, or challenge the argu-

ment that General Motors might legally have undertaken unilateral action to enforce the provisions. However, it stated: "We have here a classic combination in restraint of trade: joint, collaborative action by dealers, the appellee associations, and General Motors to eliminate a class of competitors by terminating business dealings between them and a minority of Chevrolet dealers and to deprive franchised dealers of their freedom to deal through discounters if they so choose. Against this fact of unlawful combination the 'location clause' is of no avail. Whatever General Motors might or might not have done to enforce individual Dealer Seller Agreements by action within the borders of those agreements and the relationship which each defines, is beside the point." 384 U.S. at 140, 86 S.Ct. at 1327.

In the present case, as in *General Motors*, we likewise have far more than voluntary compliance by the franchise dealers with the terms of their agreements with The News or unilateral action by The News to enforce its vertically-imposed territorial and customer restraints. Here we have proof that The News took action against the independent route dealers at the request of the franchise dealers, and conspired with them to cut off the independents' source of supply, thus excluding the latter as competitors in areas where the franchise system operated. Cf. *Klor's Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959). This case, moreover, is more offensive than *General Motors* since here most of the sources of supply, against which surveillance and threats of termination were directed, were not parties to the Carrier Agreement whom The News had an arguable power to control, but independent dealers. The News does not contend that these independent dealers were its "agents" or "employees." At best, therefore, the legality of any attempt to restrict the resale customers of these dealers is highly doubtful, see *United States v. Arnold, Schwinn & Co., supra*, 388 U.S. at 379, 87 S.Ct. 1856.

The News argues that the Carrier Agreement does not specifically restrict resales by franchise dealers at all, pointing out that the Agreement merely requires that the franchise dealer purchase from The News "a sufficient number of copies . . . to supply all single copy home subscribers within his territory" and does not specifically prohibit the franchise dealer from purchasing other copies for the purpose of reselling them to other persons. The News then contends that since the district court made no finding that The News was "firm and resolute" in the enforcement of whatever customer restrictions existed, see *Janel Sales Corp. v. Lanvin Parfums, Inc., supra*, the restrictions are not offensive. However, this contention is directly contrary to The News' position below, where its counsel conceded that it was against the basic understanding between the parties for a franchise dealer to sell in bulk to any persons. Moreover, there was evidence that on at least one occasion sales by a franchise dealer to an independent route dealer were terminated following a visit by a News representative to the franchise dealer. In view of the district court's finding that The News terminated or threatened to terminate sales to persons not franchise dealers who made "unauthorized" sales to independent route dealers, it is hardly credible that The News would not have been equally firm in preventing franchise dealers from making such sales. In any event, the question of whether the customer-restriction clause, standing alone, might be upheld is rendered academic by the court's finding, based on substantial evidence, of a conspiracy between The News and franchise dealers to prevent the independents from obtaining copies of The News for distribution.

III. *The District Court's Finding of Conspiracy to Monopolize Intrabrand Competition in the Home Delivery Market by Monopolizing Trade in the News*

Although the district court dismissed plaintiffs' claim of attempt to monopolize the newspaper market in the

New York City metropolitan area for failure to prove an intent to monopolize and that home subscribers would not purchase other newspapers in lieu of the News, the court did find that the activities of The News and its franchise dealers in precluding plaintiffs from sources of supply of the News amounted to a conspiracy in violation of § 2 of the Sherman Act to eliminate intrabrand competition in the home delivery market by monopolizing trade in the News. We disagree. An essential element of such a conspiracy is an intent to monopolize the designated segment of commerce. *Lewis v. Pennington*, 400 F.2d 806, 811 (6th Cir.), *cert. denied*, 393 U.S. 983, 89 S.Ct. 450, 21 L.Ed.2d 444 (1968); *United States v. Consolidated Laundries Corp.*, 291 F.2d 563, 573 (2d Cir. 1961). Here the trial judge not only failed to make a finding of such intent but, by affirmatively finding that plaintiffs had failed to prove an intent to monopolize the newspaper home delivery market in the New York Metropolitan area, cast doubt upon whether plaintiffs had or could prove an intent to monopolize intrabrand competition in the same home delivery market. While defendants may well have intended to preclude the independent route dealers from distributing the News in areas where franchise dealerships operated, The News did not establish franchise dealerships in many areas where the News was home delivered, including Manhattan, and continued to deal with many independent route dealers. Thus it is unlikely that a specific intent to monopolize the distribution of the News in the home delivery market could be inferred. However, in view of our affirmance of the court's finding that the activities of The News and some franchise dealers amounted to a conspiracy to restrain trade in violation of § 1 of the Sherman Act, a retrial of the § 2

claim upon remand would appear to be unnecessary.

## CONCLUSION

The News' agreements with its franchise dealers meet the requirements of the McGuire and Feld-Crawford Acts and therefore do not violate the Sherman Act. The record does not support a finding of unlawful coercion of independent route dealers to become franchise dealers or to abandon their distribution of competing newspapers. Plaintiffs lack standing to challenge The News' practice of restricting franchise dealers territorially.

The district court's finding that The News combined with certain franchise dealers in violation of § 1 of the Sherman Act to prevent some plaintiffs from obtaining copies of the News for distribution is affirmed. However, the district court's finding that this activity amounted to a conspiracy to monopolize in violation of § 2 of the Sherman Act is reversed.

The district court's dismissal of plaintiffs' claim that The News' sale of its newspaper to the franchise dealers violates the Robinson-Patman Act is affirmed.

 The case is remanded to the district court for further proceedings not inconsistent with this opinion, including a hearing to determine the extent to which each franchise dealer participated in the conspiracy to prevent independents from competing in territories serviced by them and to receive proof of any damages suffered by plaintiffs as a result of the actions of the various defendants.[13] Without deciding whether such damages can be established, damages may in any event be awarded only for loss of business or injury to competition suffered by reason of plaintiffs' inability

---

13. The argument of appellants Michael and Vito Lepore, presented by them in their separate brief on this appeal, to the effect that there is no evidence to support the claim that they conspired with The News to prevent independent route dealers from competing in territories serviced by franchise dealers must be

rejected in view of Michael Lepore's admission that he had advised home subscription customers in his territory "that the independent was no longer in business in their territory." However, upon remand, the district court will determine whether any plaintiff suffered any damages as a result of this conduct.

to obtain copies of the News for distribution because of activities of The News in combination with franchise dealers which cut off plaintiffs' sources of supply or threatened or harassed plaintiffs. No liability exists, hence no damages may be awarded, for injury to plaintiffs' business caused by The News' introduction of the franchise dealer system of distribution, the lower home subscription prices resulting from that system, or The News' termination of direct sales to independent route dealers because of its decision to substitute the franchise dealer system. In this connection the claims of the plaintiffs Huntington News Delivery, Inc. (Hand), Edward A. Shank, Harry Fox, Walter Greenberg and Hugh Holman must be dismissed, inasmuch as The News continued to sell directly to these plaintiffs and their sole claims of injury are based on the fact that they operate in areas where the franchise dealer system has been instituted and faced price competition from these dealers and price discrimination from The News, claims which we have held not compensable.

The injunctive relief provisions of the district court's judgment must be modified to accord with the foregoing, eliminating those provisions which enjoin (1) a combination or conspiracy to fix prices (including prices labelled "resale," "wholesale," "retail") (Pars. 1–4 of district court's judgment), (2) a conspiracy to monopolize intrabrand competition in the home delivery of the News (Par. 5 of judgment), (3) territorial or customer restrictions in The News' franchise agreements (Par. 6 of judgment), and (4) termination of independent route dealers (Par. 7 of judgment). The News, however, will be enjoined from surveilling or harassing route dealers for the purpose of preventing them from lawfully obtaining copies of the News, terminating or threatening to terminate dealers or others who lawfully supply copies of the News to route dealers, or falsely advising home delivery subscribers that they can obtain home-delivered copies of the News only through franchise dealers (Pars. 8–11 of judgment).

Each party will bear his or its own costs on this appeal.