Horst A. **EIBERGER** d/b/a Atlanta Dictating and Business Equipment Co., and ABP, Inc., Plaintiffs,

v.

**SONY CORPORATION OF AMERICA, Defendant.**

**No. 76 Civ. 3677 (CLB).**

United States District Court, S. D. New York.

Oct. 5, 1978.

Frank, Bernstein, Conaway & Goldman by Robert G. Levy, Berryl A. Speert, Allan P. Hillman, Baltimore, Md., Charles A. La Torella, Jr., New York City, for plaintiffs.

Rosenman, Colin, Freund, Lewis & Cohen by Asa Sokolow, Charles A. Crum, Douglas Gordon, New York City, for defendant.

## FINDINGS AND CONCLUSIONS

BRIEANT, District Judge.

This action was filed on August 18, 1976, and tried before the Court without a jury beginning on June 6, 1977 and concluding on June 15, 1977. Plaintiffs seek damages and equitable relief based on the contention that defendant has engaged in business practices violative of § 1 of the Sherman Act (15 U.S.C. § 1). Defendant denies liability, and counterclaims for the sum of $11,897.57 due and owing by plaintiffs for merchandise purchased on account, as well as for warranty fees debited to their account.

Plaintiff, Horst A. Eiberger ("Eiberger") is domiciled in the State of Georgia where he does business under the name of Atlanta Dictating and Business Equipment Company ("Atlanta Dictating"), as a sole proprietorship. Eiberger also owns and controls ABP, Inc. ("ABP") the other plaintiff in this action, which is incorporated under the laws of the State of Georgia, with its principal place of business at Atlanta.

Sony Corporation of America ("Sony"), the defendant herein, was incorporated in the State of New York on February 8, 1960. It is the wholly owned American sales subsidiary of Sony Kabushiki Kaisha of Japan. Sony Kabuskiki Kaisha is one of the world's leading corporations engaged in the development, manufacturer and sale of electronic equipment, instruments and devices. Sony has its principal place of business in this District.

Subject matter jurisdiction exists under §§ 4 and 16 of the Clayton Act (15 U.S.C. §§ 15, 26), and venue in this District is proper.

Eiberger is an experienced dealer in dictation machines and accessories, with Atlanta, Georgia serving as his primary base of operations. In early 1972, Eiberger was approached by Sony's National Sales Manager and solicited to become Sony's authorized dealer in Atlanta. In 1971, when Sony had introduced its line of electronic office dictation equipment to the United States market, it had done so by direct marketing

from various regional sales offices. However, this direct marketing approach had not met with great success, and by 1972 Sony was in the process of replacing its direct sales force with a network of authorized Sony dealerships, franchised in various locations. Thus, in the spring of 1972 Eiberger's sole proprietorship, Atlanta Dictating became Sony's authorized dealer in the Atlanta metropolitan area. In 1973 Eiberger transferred his dictation equipment business to a newly organized corporation, ABP, and this new entity continued to concern itself principally with the sale and service of Sony dictating equipment.

Early in 1974, ABP began the re-sale of Sony equipment in wholesale quantities to Mr. Siegfried Williges, a former business associate of Eiberger, and a former Sony dealer in the Tampa, Florida area. While he had been an authorized Sony dealer, Williges had organized a web of dealers throughout Florida to whom he had given both sales and service training. When Williges was terminated as a Sony dealer in 1973, Sony enfranchised and began to deal directly with the sales network that Williges had established. With the machines supplied to him by Eiberger's corporation, Williges was able to enter into competition with these authorized Sony dealers who had formerly been a part of his distribution network.

Faced with the specter of price competition created by Williges within their "territories," at least two such authorized Sony dealers began to complain to Myron Trowbridge, Sony's Regional Sales Manager for the Southeast Region, and Leo Wyett, Sony's General Manager for the same region. They urged Sony that the source of supply for Williges be cut off, thereby ending the threat posed by his price competition in the regions they served. Mr. Keith Brookins, the authorized Sony dealer for the Tampa area, sent letters to a number of other authorized dealers asking them to aid him in putting a stop to what he termed the "unethical sale of Sony dictating equipment in our area" (Pl. Exs. 16–18). Attached to each of these letters was a copy of the advertisements in which Mr. Williges had been offering Sony dictation equipment at discount prices.

Both Mr. Brookins and Mr. Peter Abdo, a Sony dealer in West Palm Beach, Florida, continued their chorus of complaints about their price cutting competitor to persons within Sony's sales hierarchy. They began to report serial numbers of machines which they had not sold, but which had been found in the service of users located within their territories.

At this time Sony did not maintain records of serial numbers sufficient to associate a machine with the name of the seller, and therefore was unable to trace the source of Williges' supply of Sony dictating equipment. Brookins and Abdo reported to Myron Trowbridge their suspicions that the source of Williges' supply was his friend Eiberger. This led Mr. Trowbridge to question Belton Franks, manager of ABP, as to whether or not ABP was acting as a supplier for Williges. Franks denied the accusations posed by Trowbridge, although he knew that ABP was Williges' principal source of supply.

Beginning in 1972 and continuing up until April of 1975, there was a rising tide of complaints by Sony retailers made to Michael P. Schulhof, Sony's Manager of Special Projects. These complaints centered upon the price competition offered by unauthorized Sony dealers within the territories delineated in Sony's authorized dealer's franchise agreements. As the complaints from dealers and Sony's Regional Sales Managers reached a crescendo in the spring of 1975, Sony prepared to act to eliminate the difficulties caused by the sale of Sony dictation equipment to unauthorized dealers. Mr. Schulhof then entered upon a new assignment as General Manager of Sony's business products division, and Mr. Irwin Gross was hired as National Marketing Manager of this division.

On April 1, 1975, Sony presented all its dealers with a modified franchise agreement which made a significant change in the warranty fee program. Before the change, a selling dealer who was unable to service a machine sold because of geograph-

ic limitations would pay a local non-selling dealer actually rendering such warranty service, at an agreed price and on a voluntary basis. No payment was made by an extraterritorial dealer without first receiving reasonable assurance from the local dealer that the claimed services actually were rendered to the user. Following the new warranty program, all that the local non-selling dealer needed to do in order to collect warranty fees from an extraterritorial selling dealer was to send to Sony the serial number of a dictating machine found within his territory. On May 1, 1975 record keeping was begun by Sony of the serial numbers of the machines sold to each dealer, so that each could be traced readily to the selling dealer or point of origin. Once an extraterritorial machine had been traced back to its source by Sony, that dealer's account with Sony was debited in an amount commensurate with a predetermined warranty fee schedule which was made a part of each dealer's franchise agreement. As a practical matter, the amount of the warranty fee debit was sufficient to eliminate any profit which a dealer would make from selling to unauthorized dealers for resale outside his territory.

In contrast to the warranty fee program which existed prior to its institution, the new program functioned in such a manner as to be unaffected by whether or not warranty service (repairs, adjustment or user instruction) was actually being rendered to the user of a particular unit of Sony dictation equipment. It was sufficient that the machine be "found" in his territory; on so finding a machine the local non-selling dealer became entitled to a warranty fee without more; debited against the account with Sony of the franchised extraterritorial dealer who had been shipped the machine originally from defendant.

The record is replete with evidence that Sony knew that many of the serial numbers being reported by dealers seeking warranty fees belonged to machines to which the local dealers had actually rendered little or no warranty service. Sony made no inquiry of its dealers as to when the service was rendered, or what service was given, and there was no concern shown by defendant whether or not the given machine was still within the 90 day warranty period. In fact, there was evidence presented, and unrefuted by Sony that some of the serial numbers being reported under the new warranty program belonged to machines which had not yet even been sold to users.

One such instance revealed in the testimony of Mr. McCloud at trial involved an authorized Sony dealer in Nashville, Tennessee, one Bruce Tennyson, described as being 6 feet, 2 inches in height, and weighing 240 pounds. On November 1, 1975 Tennyson and his brother invaded the Nashville office of JLM Office Products, a business operated by the witness McCloud, forcibly took new Sony dictating equipment belonging to JLM out of the cases, and recorded the serial numbers. None of these machines had yet been sold to any ultimate user. Tennyson's unlawful intrusion caused McCloud to summon the police. Tennyson was arrested, but ultimately charges against him were dropped by agreement. On November 11, 1975 Sony billed ABP for warranty charges in the amount of $120 on two machines located by Tennyson in Nashville as a result of his raid on competition. This amount was credited to Tennyson's business (Exs. 32 and 43). It was clear and known to Sony at that time that no warranty service or installation had been or would be rendered by Tennyson for these machines. In this matter Sony acted with direct knowledge. At the time, Trowbridge, Sony's Regional Sales Manager knew of the incident. He testified that Tennyson admitted that he "kind of went storming in there" [to JLM's premises] and had been arrested as a result of and while engaged in efforts to get the serial numbers for the machines to permit a warranty charge to be made against the dealer who had released them to JLM. This information must have been given Trowbridge by telephone on the day of the incident. He told Tennyson to put the claim in writing. See Ex. 25, dated November 1, 1975 received by Sony's Atlanta office on November 3, 1975.

In mid-1975 ABP began the sale of dictating machines to European Dictating

Suppliers, Ltd., Inc. operating out of Hollywood, Florida. European resold the Sony equipment which it bought from ABP to a number of dealers in dictating equipment across the country. Among these dealers was JLM Office Products, and All Makes Dictating Machine Company of Los Angeles, California. These dealers in turn engaged in the price cutting activities which moved authorized Sony dealers to complain to Sony.

I find that the primary purpose of the new warranty plan was to prevent price cutting and eliminate competition from machines sold by authorized Sony dealers for resale to others. There were additional purposes. Sony desired to keep all its dealers operating profitably and to assure that all parts of the country would be covered by authorized dealers ready and willing to render warranty and repair services. This is less likely to occur when non-authorized dealers are skimming the cream from the market place by discount, off the shelf sales effort, followed up with little or no customer service. Also, Sony's marketing plans envisaged that the dealer would "install" the machine. While this entailed opening the carton and plugging in the electric line, it also included advice and instruction in the best use of the machine. In some cases, such installation was an essential part of customer satisfaction and led to the sale of more machines to the same customer. But there are undoubtedly some customers who do not need it, and would prefer to pay less money, taking the product in its carton and without any dealer attention. It was to this latter group that the unauthorized dealers appealed, paying more and charging less than competition, and giving less service and less sales effort.

Once the new warranty plan had been placed in operation, it became apparent to Schulhof, Trowbridge and others of Sony involved in the warranty program that ABP was engaging in large scale wholesaling of Sony dictation equipment to dealers outside of its territory. The new warranty plan resulted in a large number of debits to the ABP account, as serial numbers from machines resold by ABP were turned in by dealers from across the country.

ABP failed to pay Sony for the warranty fees debited to its account. Eiberger asked Sony to furnish proof that warranty service had indeed been rendered by the other dealers who had sent in the serial numbers of machines found within their territory, and which had been traced back to ABP. Sony did not provide any such information, and I find that such information did not exist.

In February of 1976, following a demand by Sony that all warranty fees debited to ABP be paid in full, which demand was met with a refusal by ABP, ABP was informed that no further shipments of Sony equipment would be forthcoming until such fees were paid. ABP's request for additional information relating to the servicing of equipment for which it had been debited was ignored by Sony, and in a letter dated April 12, 1976, plaintiffs were told that the dealer franchise which had expired on March 31, 1976, would not be renewed. The sole reason given by Sony for non-renewal of the ABP franchise was the fact that the warranty fees debited to ABP had remained unpaid.

In fact, as early as January 1976, according to Trowbridge, and perhaps earlier, according to Aiken, Sony was proceeding with plans to replace ABP as the Sony authorized dealer for the Atlanta area. Early in March 1976, Marvin Buchana, the authorized dealer in Birmingham, Alabama met with Trowbridge. They discussed the possible appointment of Buchanan to the ABP franchise following the anticipated termination of plaintiff. Trowbridge asked Buchanan to prepare a plan for the assumption of the Sony dealership in Atlanta. This plan was prepared by Buchanan and presented to Schulhof, Wyett, and others at meetings taking place April 8, 9 and 10, 1976, at the Sony National Dealer's Convention in Atlanta.

There was conflicting evidence presented on whether Trowbridge and Buchanan were engaged in the solicitation of ABP's sales force prior to the termination of ABP's franchise. Aiken testified that Trowbridge told him in February of 1976 that Sony would not consider replacing ABP with a

dealer who would not hire Carl Froeling, ABP's sales manager. Franks testified to frequent phone conversations between Trowbridge and Froeling beginning in March 1976, after Sony had begun to hold back shipments of dictating equipment to ABP in response to the non-payment of warranty fees. Trowbridge's business expense vouchers reveal that he had lunch with Carl Froeling and one other person during the week ending March 13, 1976 (Pl. Ex. 100). When Eiberger offered to begin training his sales force in copier sales, Froeling refused to be trained for such work. Froeling, now employed by Buchanan, did not testify. I find that ABP's sales force was solicited prior to cancellation. Even if this disputed fact were resolved in defendant's favor, it is noteworthy that almost immediately after ABP's termination, Froeling and two other ABP salesmen went to work for Buchanan selling Sony dictation machines in Atlanta. Franks testified that after these salesmen left, customer lists, salesmen's correspondence with ABP customers, and sales training materials said to be valued at $180.00 were found missing unexplainedly from the ABP business premises.

At the time its salesmen left, ABP was engaged in the sale of other office equipment besides Sony dictation equipment. Included in ABP's product line were Uher recorders and Toshiba calculators, but Sony dictation equipment amounted to 50% of ABP business. Eiberger testified that he evaluated the possibility of acquiring another line of dictation equipment and reached the conclusion that he would not be able to do so. This was based on the fact that IBM, Dictaphone and Lanier were sold through direct sales outlets in Atlanta, while Norelco, the only remaining member of the five largest companies, had been doing business through the same dealer in Atlanta for twenty years. Thus, the termination by Sony resulted in a total immediate loss of the plaintiffs' retail dictation machine business in Atlanta, as well as his resale business.

■ In effect, and by its intention, Sony was imposing, in the guise of its new warranty program, a territorial restraint on resale by its dealers. As such, this was a vertical restraint, as distinguished from the typical horizontal restraint resulting from an agreement among competitors on the same level of distribution of a given commodity as to the division of markets along territorial lines. While the latter are *per se* violations of the antitrust laws [*White Motor Co. v. United States*, 372 U.S. 253, 83 S.Ct. 696, 9 L.Ed.2d 738 (1953)], the former must be tested in light of the "rule of reason" most recently explained in *Continental T. V., Inc. v. GTE Sylvania Incorporated*, 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977).

■ I find that the new warranty program instituted by Sony April 1, 1975 and which remained operational until about September of 1976 was an unreasonable restraint of trade in the dictation equipment industry, violative of § 1 of the Sherman Act (15 U.S.C. § 1). Judged, as it must be, by the rule of reason applied by the Supreme Court in *Continental T. V., supra*, these territorial restraints imposed by Sony upon its authorized dealers cannot be justified as having a valid business purpose. Whatever slight benefits the plan may have had in stimulating interbrand competition, these were far outweighed by its adverse effect upon intrabrand competition.

Sony has attempted to justify its new warranty plan by pointing out claimed benefits to interbrand competition. Defendant asserts that the program's purpose and effect was to assure that the user of Sony dictation equipment would be provided with the warranty coverage necessary to make Sony's product competitive in the market. This espoused purpose was simply not borne out by the evidence. Indeed, the evidence is overwhelming that the primary purpose and effect was to make resale of the machines to unauthorized dealers unprofitable. Complaints made by Trowbridge to Eiberger admitted to by Trowbridge in his deposition bear this out. If Sony's purpose were to assure that customers were receiving proper service under the Sony warranty, there would have been a concern shown by Sony for information such as when and

where such service was performed, as well as whether or not the machines for which dealers requested credits were still within the 90 day warranty period. The mere sending in of serial numbers by dealers would tell Sony nothing with regard to whether these machines had been serviced by the dealers, or whether the machines were still eligible for such service. Sony asserts that it had no reason to suspect that certain dealers were reporting serial numbers of machines to which they had not rendered service, but the weight of the evidence belies this assertion. The record contains an abundance of documentary and testimonial evidence apart from the Tennyson incident leading to the inescapable conclusion that Sony knew that the serial numbers being reported by dealers seeking credit were not necessarily reported as a result of their having rendered service to the machines represented by the numbers reported. The testimony of Mr. McCloud at trial as well as that of Myron Trowbridge, Sony's Regional Sales Manager for the Business Products Division, reveals that Sony well knew that one of its dealers, Tennyson, was seeking warranty credit for unsold machines which were merely on the business premises of an unauthorized dealer competitor. Mr. Trowbridge knew that Bruce Tennyson, Sony's authorized dealer in Nashville, had obtained serial numbers of unsold machines located in the offices of JLM Office Products. Nevertheless, when Mr. Tennyson asked for warranty fees on these machines, Mr. Trowbridge saw to it that credit was given, and the account of the plaintiff debited. We fail to discern how disorderly entry to the business premises of a competitor to copy numbers from unsold machines can be characterized as "warranty service."

There is additional evidence in the record to indicate that at other times Sony issued credit upon machines which were merely "found" or "intercepted" within another dealer's territory (Pl. Exs. 29, 31, 149, 150). The purpose of the new warranty plan was not to assure that customers obtain warranty service, but rather to enforce the territorial divisions made in Sony franchise agreements. Sony instituted the program as a response to a rising tide of complaints by its authorized dealers that unauthorized dealers were cutting prices. The letters written by Keith Brookins, Sony's authorized dealer in Tampa (Pl. Exs. 16–18), in which he complained of the "unethical sale of Sony dictating equipment in our area" reveals an attitude typical among authorized Sony dealers with respect to extraterritorial sales. Dealers who sold outside their territories were characterized as "prostitutes," or "bootleggers" by other authorized dealers (PL. Exs. 2, 155). The purpose behind the new warranty plan was to punish these "bootleggers" by exacting an economic penalty for their extraterritorial sales. By so doing, Sony would be able to prevent dealers from wholesaling Sony dictating equipment, and thereby cut off the supply of Sony products to unauthorized dealers. The effect upon competition of such a program would be the elimination of intrabrand competition within each authorized dealer's territory. This would and did result further in the price of Sony dictation equipment within any given territory being kept at an artificially high level.

Sony has a right to enforce a program of warranty and installation service to the user of its dictation equipment. But the record is devoid of evidence that the unauthorized dealers to whom the plaintiff sold failed to provide such services to their customers. Indeed, the evidence presented on the matter is to the contrary. The unauthorized dealers to whom ABP sold were providing their customers in most cases with warranty and installation service. Under these circumstances, there was no reason for Sony to award "warranty fees" to local dealers, unless, as was the case, these fees were levied for another purpose, to penalize dealers for extraterritorial sales for resale.

Sony was at the time the new warranty program was instituted, among the leaders in the dictation equipment field. Its market share in the year 1975 was over 12%, and it was among the top five sellers of input word processing equipment in the United States. Together, the top five sellers were responsible for 95% of the sales of

**1284**

such equipment. Clearly, Sony was among the leaders in the industry and admittedly the fastest growing of the top five (Pl. Ex. 241). Thus, the plaintiff's assertion that Sony was one of the principal sellers dominating an oligopolistic market is well borne out by the evidence. Those cases which have found vertical territorial restraints not unreasonably injurious to competition have involved situations in which the company imposing such practices was either a new entrant into a highly competitive market or an established seller struggling to survive in a market characterized by "bloody competition," (see *Sandura v. Federal Trade Commission,* 339 F.2d 847 (6th Cir. 1964); *Snap-On Tools Corp. v. Federal Trade Commission,* 321 F.2d 825 (7th Cir. 1963). The damage to intrabrand competition far outweighs any benefits which may have accrued to interbrand competition as a result of the program.

■■■ In addition to the unreasonable restraint imposed by the new warranty program, the manner in which it was instituted and the way it functioned compels the conclusion that the program was the result of a conspiracy between several of Sony's authorized dealers carried out with the cooperation and aid of the defendant. The object of the conspiracy was the elimination of unauthorized dealers in Sony dictation equipment from the market. This was to be accomplished by rendering it unprofitable for any authorized Sony dealer to sell outside of his assigned territory. Also, those dealers such as ABP who refused to comply with the new policy would have their franchises terminated. A number of dealers pressured Sony to take action, and when it responded to their requests, the conspiracy came into being. A horizontal conspiracy entered into by competitors, in an effort to divide up markets is a *per se* violation of the antitrust laws. *Timken Roller Bearing Co. v. United States,* 341 U.S. 593, 71 S.Ct. 971, 95 L.Ed. 1199 (1951). An explicit agreement between the co-conspirators is not required for the law to have been violated. It is enough that there exists an implicit agreement to carry out the illegal scheme. *United States v. General Motors Corp.,* 384 U.S. 127, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1966). Furthermore, it is of no consequence that the conspiracy, although horizontal in its impetus was imposed in a vertical fashion by enlisting the manufacturer. In his concurring opinion in *White Motor, supra,* Mr. Justice Brennan wrote:

"If it were clear that the territorial restrictions involved in this case had been induced solely or even primarily by appellant's dealers and distributors, it would make no difference to their legality that the restrictions were formally imposed by the manufacturer rather than through interdealer agreement." 372 U.S. at 267, 83 S.Ct. at 704.

Therefore, where dealers enter into an implicit agreement effecting or implementing an anticompetitive scheme, it makes no difference with respect to its illegality that Sony, itself not a dealer, was the one whose acts were needed to put the program into effect.

I find that a conspiracy for the division of territories existed among the authorized Sony dealers well before the new warranty program came into effect (see Pl. Exs. 143, 9, 10, 11). The correspondence passing among the dealers, and between the dealers and Sony indicate that there was an understanding among authorized dealers that they were not to sell Sony equipment outside of their territory. At trial, Mr. Aiken's testimony revealed that there was such a policy, that it was at first acquiesced in by Sony, and later openly aided by Sony by means of the new warranty program (Tr. pp. 144–46). Other exhibits in the record corroborate the testimony of Mr. Aiken that a conspiracy for the division of markets as well as the elimination of unauthorized dealers did exist (Pl. Exs. 144, 147).

The facts of the case at bar are strikingly similar to those in *Bowen v. New York News, Inc.,* 522 F.2d 1242 (2d Cir. 1975). In that case, the News entered into a conspiracy with some of its franchised dealers, all of which had been awarded exclusive territories, in order to seek out by surveillance the source from which unauthorized dealers were receiving their supply of the News.

Those franchised dealers who were the source of the independent dealers' supply were threatened with the termination of their franchises. As was the case with Sony, it was the franchised dealers who requested that the News do something about price-cutting independent dealers within their designated territories. The court held at p. 1256:

"The News' conduct, undertaken pursuant to an agreement with the franchise dealers and for the purpose of restricting the access of terminated independents to the News, amounts to an unlawful conspiracy in violation of § 1 of the Sherman Act and is remarkably similar to that condemned by the Supreme Court in *United States v. General Motors Corp.,* 384 U.S. 127, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1966). In that case a number of dealers, each of whom had been franchised by General Motors to sell GM cars in a 'location' assigned to the dealer in the Los Angeles area, began reselling cars to 'discount houses' who then sold to consumers. Other similarly-franchised General Motors dealers thereupon complained about these practices. General Motors reacted by obtaining agreement from each of its franchised dealers not to sell to the discounters. Three associations of its Los Angeles franchised dealers undertook jointly to police these agreements, supplying information to General Motors which was used to force non-cooperating dealers to refrain from discount house sales."

■ When Sony's authorized dealers complained about discounters, defendant responded by entering into an illegal conspiracy with them, the purpose of which was to discover the sources of supply of the unauthorized dealers, and make it unprofitable for the sources to continue. By debiting of the accounts of extraterritorial wholesalers of Sony equipment, Sony made it impossible for such supplies to continue on a basis profitable both to the reselling authorized dealer, and the discounter. In the words of the Supreme Court in the *General Motors* case (384 U.S. at 145, 86 S.Ct. at 1330):

"There can be no doubt that the effect of the combination or conspiracy here was to restrain trade and commerce within the meaning of the Sherman Act. Elimination, by joint collaborative action, of discounters from access to the market is a *per se* violation of the Act."

Therefore, we conclude that the defendant has also committed a *per se* violation of the Sherman Act.

Our decision is not affected by the recent Second Circuit case *Oreck Corp. v. Whirlpool Corp.,* 579 F.2d 126 (1978). In *Oreck,* the plaintiff alleged that the defendant conspired with its customer, Sears, to eliminate Oreck as a dealer in Whirlpool vacuum cleaners. The Court held that the defendant's decision to stop selling vacuum cleaners to the plaintiff was to be judged under the rule of reason, and not considered a *per se* violation of the Sherman Act. However, the facts in *Oreck* were dramatically different from those in the case at bar. The Court held at p. 130 of 579 F.2d:

"The complaint did not allege, the evidence at the trial did not show, and the counsel in summation did not argue, that Whirlpool was attempting to maintain high resale prices for its products by conspiring with its distributor or that its actions toward Oreck were an effort to chastise a dealer for refusing to cooperate in a scheme to fix or maintain prices."

■■ With respect to damages, there is sufficient evidence to sustain the inference that ABP had been injured by Sony's statutory violations. As the Supreme Court concluded in *Zenith Corp. v. Hazeltine,* 395 U.S. 100, 114, n.9, 89 S.Ct. 1562, 1571, 23 L.Ed.2d 129 (1969):

"[The] burden of proving the fact of damage under § 4 of the Clayton Act is satisfied by its proof of *some* damage flowing from the unlawful conspiracy; inquiry beyond this minimum point goes only to the amount and not the fact of damage. . . . . "

The prerequisite causal connection between defendant's wrongful conduct and the injuries endured by the plaintiff is established. Thus plaintiff can prove his damages by varying methods, which will be effective as long as they remove the judgment from the realm of pure speculation.

" . . . the jury may make a just and reasonable estimate of the damage based on relevant data, and render its verdict accordingly. In such circumstances 'juries are allowed to act upon probable and inferential as well as direct and positive proof.' [citations omitted]. Any other rule would enable the wrongdoer to profit by his wrongdoing at the expense of his victim." *Bigelow v. RKO Pictures, Inc.*, 327 U.S. 251, 264–265, 66 S.Ct. 574, 580, 90 L.Ed. 652 (1946).

There are two chief components comprising the economic injury suffered by ABP. The first is the loss of profits on lost sales. Plaintiff contends that ABP was inhibited, prior to the expiration of its dealer agreement with Sony, from selling Sony products to Williges and European for redistribution and hence lost profits on additional sales which it would have made but for such inhibitions. The record contains sufficient instances of Sony's harassment and attempted coercion of the plaintiff, including the new automatic warranty fee policy and Sony's eventual withholding of credit and equipment shipment to ABP, to support the contentions of lost sales. The fact of lost profits from uncompleted sales is specifically substantiated by the trial testimony of Eiberger, Franks, Williges, and that of two of European's customers, Jerry McCloud, and Milton Ferguson, representing JLM and All Makes. The deposition of Barry Roth also contains matter alleging prevented sales, but this testimony, as will be discussed later, is of questionable value.

While it is always a burdensome task to show what might have been, the ordeal is made even more difficult in this case in that even what was, is not described with clarity. Damage testimony for the plaintiff was offered through Paul G. Wist, a certified public accountant. By determining the difference between the profit from actual sales and the profit from sales which would have been, Wist quantified the lost profit element of ABP's damages.

Wist relied on several assumptions in this methodology. He began by calculating the pre-tax profit on actual sales to Williges and European for the twelve months prior to termination of the ABP's dealership. He then calculated lost profits on lost sales by using the actual gross profit percentage experienced on sales that were actually made to each dealer and applying the percentage to a set of projected sales figures.

Defendant's expert criticized the use of the actual gross profit percentage in that the plaintiff offered no evidence showing that the gross profit ratio would remain constant in the event the projected increases in sales were achieved. Actual gross profit percentage on sales made to European was 9.19%, on sales made to Williges was 5.44%. These percentages were calculated using actual gross profit percentage experienced on sales actually made during the twelve month period prior to termination of ABP's Sony dealership. Defendant also criticized Wist's procedure for arriving at the average sales price per dictation machine resold, a component used in the projection of lost profits. To make this determination, Wist divided the actual total sales volume to Williges and European by the total number of units they purchased. This calculation yielded an average sales price of slightly more than $222.00 per unit. Different Sony dictation machine models sell at different price levels. There is no evidentiary basis for the assumption that the mix of machines would remain the same with the projected increase in volume.

However, there is no evidence in the record to establish a contrary conclusion, and both the gross profit percentage and average sales price assumptions are based on past performance. Accordingly, the Court finds these assumptions reasonable. Where the defendant adduces no evidence of alternative methodologies or statistics, but merely criticizes those employed by the plaintiff's expert, acceptance of the projections of plaintiff's expert is appropriate, since they do have a rational basis. See *Taxi Weekly, Inc. v. Metropolitan Taxicab Board of Trade, Inc.*, 539 F.2d 907, 914–15 (2d Cir. 1976).

Despite defendant's criticism of the figure used by Wist to represent incremental expenses, the Court finds the estimate of 20% of the gross profit of dealer sales to be

reasonable. Calculations applying the 20% figure to the actual gross profit percentages indicate an adequate allowance to cover the rather negligible expenses of handling and relabeling the equipment, invoicing the customer, and to allow for a one percent override commission on gross sales paid to Belton Franks.

■ The most significant variable in the lost profits computation is the volume of sales which would have occurred but for the intimidating effect of Sony's merchandizing policies. Wist assumed that Williges would have purchased 80 units a month for the 12 month period prior to the dealership termination. The figure is based on Williges' statement during trial that he would have bought 60 to 100 Sony machines a month if ABP had been able to supply his requirements. For European, Wist estimated that Sony purchases from ABP would have increased to 100 machines a week by December 1975 and retained that level until ABP's dealership was terminated. This averaged out to approximately 250 machines a month. The monthly purchases by European were assumed to have been as follows: September, 100; October, 200; November, 300; December, 400; January, 400; February, 400; March, 400.

The Court finds the plaintiff has not met its burden of proof with respect to these estimates. In the course of cross-examination of plaintiff's expert, it was disclosed that Wist's "would have been" sales projections were made without knowledge of European's or Williges' companies, their financial status, sales volume, sales staff, service facilities or dealers. Wist made no examination of the industry, no study of statistics from which to gauge the expansion, if any, of the market. Neither Williges nor Roth had any documentary evidence to substantiate their assertions that they would have purchased that many more machines from ABP had they been available.

The projections for Roth are particularly fanciful. The evidence on which they are based, Roth's deposition, is of suspect credibility. Roth was unable to place any concrete estimate on the total quantity of Sony dictating machines he might have purchased from ABP, and he refused to answer any questions regarding the assets, sales volume, or staff of European. Without such information it is only speculation as to whether European had the ability to increase its purchases of Sony products from ABP significantly. The value of any estimate of this increase derived from Roth's deposition is seriously undermined.

Although the plaintiff need not establish damages with mathematical certainty, mere speculation is not a sufficient pedestal on which to balance recovery. *Bigelow, supra.* The absence of documentary evidence in the form of sales orders, invoices or correspondence to substantiate the frustrated purchases is mitigated, however, to some extent by the fact that most of ABP's business, and that of its customers Williges and European, was conducted by telephone. It is logical that there would be no written memorial of orders for machines which were not available. Here, as in *Bigelow, supra,* defendant's tortious acts

". . . precluded ascertainment of the amount of damages more precisely, by comparison of profits, prices and values as affected by the conspiracy, with what they would have been in its absence under freely competitive conditions. Nevertheless, we hold that the jury could return a verdict for the plaintiffs, even though damages could not be measured with the exactness which would otherwise have been possible."

The Court will make its own reasonable estimates of lost sales. Williges, with 18 years of experience in the dictation machine business, is a former authorized Sony dealer. The 60 to 100 unit figure he testified to as representing his desired monthly purchases from ABP corresponds to the quantity of machines he had purchased from Sony while still an authorized dealer in the year ending September 30, 1970. Also, a chart introduced at trial listing purchases of Sony dictation machines, parts and accessories from Sony by the authorized Florida dealers who, prior to 1974, had been unauthorized sub-dealers of Williges, indicates a general increase in regional sales of Sony dictation

machines from 1974 through 1976 and a particularly dramatic increase between 1975 and 1976 in the sales of all but one dealership. This general increase in purchases adds support to Wist's projections as to Williges, while the marked increase between 1975 and 1976, the interval during which Williges' supply of machines from ABP was limited and eventually stopped, tends to support the fact that Williges had a strong impact on the market. At the time Williges was out of the Sony market in Florida, the authorized dealers experienced a sharp rise in sales. On the facts and circumstances given, the Court finds a 60 unit per month projected Sony sales volume for Williges not unreasonable, selecting the conservative end of Williges 60 to 100 per month estimate.

Having disregarded the assertions contained in Roth's deposition, the Court relies on the testimony of two of Roth's customers who both stated that they placed orders with European for Sony machines which were not filled in their entirety. McCloud of JLM testified that he would have ordered $7,000 to $10,000 of Sony machines a month (28 to 40 machines) if European had been able to fulfill JLM's requirements. The fact that these dealers were selling at list while the authorized Sony dealers in their area were selling above list price adds to the credibility of the increased demand for Sony machines from European, as does testimony from these customers that European was their only source of Sony dictating equipment. The Court finds 100 units per month to be a reasonable projection of actual and projected sales based on the testimony of European's customers and the actual purchases made by European. The lost net profit on lost sales to Williges prior to termination was $6,355 and for lost sales to European was $14,691.

The second element of damage suffered is the reduction in the value of plaintiff's business as a going concern by the termination of the Sony dealership agreement. Eiberger testified to the fact that no alternative sources of supply of dictation machines were available to mitigate the damage to his business from the loss of the Sony dealership. In appraising the value of this deal-ership to ABP, Wist computed the reduction in value of the business which was attributable to loss of actual user sales and the reduction attributable to loss of actual and projected lost sales to European and Williges. Using the actual user sales for the twelve month period ending March 31, 1976, and deducting an estimated 35% of gross sales as an expense figure, the profitability of the user sales component of ABP's Sony business was $14,865. The profitability of the dealer sales utilizing the assumptions reached in the lost profits computation was $21,046.

Wist applied a capitalization rate of 20% or a factor of 5 to the actual pre-tax earnings of $14,865 on user sales and a capitalization rate of 50% or a multiple of two to the projected annual pre-tax earnings of Williges and European. He then subtracted $40,000, which represented the value of ABP's tangible assets. According to Wist's methodology, the value of the Sony portion of ABP's business was $210,391. The capitalized earnings are based on Wist's projected sales of 80 Sony dictating machines a month to Williges and 400 a month to European.

Plaintiff's selection of the last twelve months prior to termination of the dealership as the base for capitalizing earnings was criticized by the defendant. Sony contends an average of the actual earnings for the three and one half years during which ABP sold Sony dictation machines would be a more realistic measure of the value to ABP of its Sony dealership. There is sufficient evidence, however, to indicate that a simple average would underestimate the true value of ABP's Sony business. The following chart will illustrate:

| Total Sony Profits | Months | Total Sony Profits |
|---|---|---|
| 1/1/73 – 9/30/73 | 9 | $ 9,254 |
| 10/1/73 – 9/30/74 | 12 | (17,171) Loss |
| 10/1/74 – 9/30/75 | 12 | 16,538 |
| 10/1/75 – 3/31/76 | 6 | 8,136 |
| | 39 | $ 16,757 |

Profits per year = $4,788. Average

The earning pattern established for the twelve months prior to non-renewal of the dealership is sufficiently representative to

be used as the value of ABP's business attributable to Sony dictation equipment sales based on the fact the Sony business was a new business in a market evidencing increasing demand for the product.

The capitalization rates selected by plaintiff's expert should be modified. In *Vandervelde v. Put and Call Brokers and Dealers Ass'n.*, D.C., 344 F.Supp. 118, capitalization is described as the "price which men will pay for [a business]." Dewing, *Financial Policy of Corporations*, 288 (5th ed.). Dewing continues:

> ". . . the rate at which a business shall be capitalized to obtain its value, will depend on the confidence the buyer may feel in the continuation of the earnings . . . .. The greater the risk, the greater the doubt of continued earnings, the lower is the capitalized value of these earnings . . . .."

Although many factors are involved, the critical risk to ABP's business was the possibility ABP would not continue as a dealer in Sony products. This risk was identical with respect to user as well as dealer sales; the capitalization rate should also be the same. Eiberger testified that no other brands of dictation machines were available to substitute for the Sony machines once the latter supply was eliminated, thus indicating that the damage from termination of the dealership could not be mitigated. The risk involved in such a business, depending for its sustenance on the good will of Sony, is deemed substantial. Based on these circumstances, the Court applies a capitalization rate of 50% or two times the pre-tax earnings to both dealer sales and user sales. Accordingly, the damages to the going concern value of plaintiff ABP is the capitalized earnings, $71,822, less the value of the tangible business assets recovered, which is $40,000. The parties have stipulated that plaintiff owes defendant $5,187.95 for goods delivered as set forth in the counterclaim. The unearned warrantee fees portion of the counterclaim represents an illegal levy or charge and cannot be recovered.

Accordingly, a recapitulation of plaintiff ABP's damages is as follows:

| | | |
|---|---:|---:|
| Profits on lost sales to European (p 25) | $14,691.00 | |
| Profits on lost sales to Williges (p 25) | 6,355.00 | |
| Total, profit lost on sales to dealers | | $ 21,046.00 |
| Going concern value: | | |
|   Profit on retail sales to users (p 26) | 14,865.00 | |
|   Profit on dealer sales (*supra*) | 21,046.00 | |
|   Subtotal | 35,911.00 | |
| Capitalized at a rate of 50%    a factor of 2 (p 27) | x 2 | |
| | 71,822.00 | |
| Less, tangible assets (p 26) | 40,000.00 | |
| Net damage to going concern value | | 31,822.00 |
| Total Damages | | 52,868.00 |
| | | 3 |
| Trebled by statute | | 158,604.00 |
| Less Counterclaim for goods sold | | 5,187.95 |
| NET TOTAL DUE PLAINTIFF ABP: | | $153,416.05 |

Pre-judgment interest at 6% per annum is awarded, with the computation to be made in accordance with New York CPLR § 5001(b).

Settle a judgment on waiver of notice, or on ten (10) days notice of settlement, to be submitted together with a computation of the pre-judgment interest, which judgment should be received for signature on or before November 23, 1978.

The foregoing shall constitute findings of fact and conclusions of law pursuant to Rule 52(a), F.R.Civ.P.