**FUCHS SUGARS & SYRUPS, INC. and Francis J. Prael, doing business as Lewis & Co., Plaintiffs-Appellees-Cross-Appellants,**

v.

**AMSTAR CORPORATION, Defendant-Appellant-Cross-Appellee.**

**Nos. 164, 165, Dockets 78–7188, 78–7222.**

United States Court of Appeals, Second Circuit.

Argued Jan. 18, 1979.

Decided June 8, 1979.

---

1026

H. Richard Wachtel, New York City (Le-Boeuf, Lamb, Leiby & MacRae, New York City, Grant S. Lewis, William G. Primps, John S. Kinzey, Jr., Gilbert A. Samberg, New York City, of counsel), for plaintiffs-appellees-cross-appellants.

William E. Willis, New York City (Sullivan & Cromwell, New York City, James H. Carter, William M. Dallas, Jr., Steven E. Harbour, Amstar Corp., Law Dept., John C. Reynolds, Frederick M. Porter, New York City, of counsel), for defendant-appellant-cross-appellee.

Before LUMBARD, MOORE and MANS-FIELD, Circuit Judges.

LUMBARD, Circuit Judge:

Two sugar brokers, Fuchs Sugars & Syrups, Inc. ("Fuchs") and Francis J. Prael ("Prael") brought this action in the Southern District of New York against the Amstar Sugar Corporation ("Amstar"), a large sugar refiner, alleging antitrust violations under Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2. The suit was triggered by Amstar's decision in 1974 to terminate the services of Fuchs and Prael as its general sugar brokers.

At the conclusion of a three-week trial before Judge Ward, the jury found that Amstar had conspired to restrain trade in violation of § 1 of the act. With respect to § 2, the jury found that Amstar had not attempted to monopolize the sugar market. The jury awarded damages totaling $150,-000 before trebling by the Court. The Court denied plaintiffs' request for an injunction compelling Amstar to reinstate them as its general sugar brokers.

After the verdict, Amstar moved for judgment n. o. v. on the § 1 claim on the ground that there was no evidence of a combination or conspiracy. Judge Ward denied the motion in an opinion reported at 447 F.Supp. 867 (1978). Amstar now appeals from the judgment entered on the verdict. Plaintiffs have cross-appealed the denial of their motion for injunctive relief.[1]

On appeal, Amstar argues that even if a corporation can conspire with its own agents in violation of § 1, plaintiffs introduced insufficient evidence to support a jury finding that there was such a conspiracy. We agree and therefore must reverse the judgment and dismiss the complaint. The record before us shows no more than a unilateral decision by Amstar to substitute one distribution system for another. It does not show a conspiracy with anyone, as the following recital of the facts discloses.

Large food manufacturers often distribute their product through a network of geographically dispersed commission agents called brokers, who normally represent several manufacturers at a time. Reliance on these brokers avoids the greater expense of employing full-time salaried sales personnel in each location where the product is sold.

These food brokers act as the manufacturers' agents in negotiations with wholesalers. As agents, the brokers do not purchase or take possession of the manufacturers' goods, bear any of the financial risk for these goods, or possess any discretion as to the pricing of the goods. Rather, their function is simply to bring a buyer and seller together in the hope of initiating a sale at a price and on terms agreeable to both.

Sugar refiners employ a network of brokers of the foregoing type, known as sugar brokers, to market their product to the wholesalers. These brokers are either direct or general brokers. The general broker acts simultaneously as an agent for more than one sugar refiner while the direct broker represents only one such refiner.

Amstar is the largest refiner of sugar in the United States, selling its product to three classes of customers: industrial purchasers, grocery chains, and institutional purchasers. Until it reorganized its distribution process in March of 1974, its marketing procedures included the use of general sugar brokers, direct sugar brokers and its own sales force.

For many years, the appellees, Fuchs and Prael, acted as general sugar brokers for Amstar from their principal offices in the New York area. In their capacity as Amstar sales agents, however, their authority was extremely limited. They were permitted only to quote to potential customers sugar prices which were fixed by Amstar; they possessed no pricing authority themselves. Any orders placed by customers with the brokers were subject to final approval by Amstar. Once approval was obtained, the sugar would then be shipped by Amstar directly to the customer and Amstar would bill the customer. The brokers neither took possession of nor title to the sugar and were compensated only by Amstar, on a commission basis, for their services in initiating the sale.

Although acting as sales agents for Amstar, Fuchs and Prael, together with Amstar's other general sugar brokers, engaged in certain practices on behalf of Amstar's customers which at times affected the price paid for Amstar sugar. This conduct included: making recommendations to customers regarding the position (i. e., the quantity, price and terms for sugar) they should take in the market; shopping among the various sugar refiners for the best price for sugar buyers; obtaining from Amstar special prices and terms for certain customers; and giving customers information concerning the prices and terms being offered

---

1. The complaint, insofar as § 2 is concerned, alleged that in terminating its general sugar brokers Amstar was attempting to monopolize the sugar industry. Despite the large market share enjoyed by Amstar and its apparent price leadership in the field the jury found no attempt to monopolize the market. Plaintiffs chose not to appeal from that part of the judgment.

by Amstar to other customers. In short, while the general brokers were, in principle, agents of Amstar, they at times acted more nearly as purchasing agents for Amstar's customers. Their conduct, moreover, often had the effect of reducing the price of Amstar sugar and Amstar's profit margin.[2]

As a result, Amstar began to move away from the use of general sugar brokers. By 1969, only about fifteen general brokers were still employed by Amstar. Finally, on March 22, 1974, Amstar announced to all of its remaining general brokers that it would terminate use of their services on March 30. Thereafter, some of the general brokers were offered positions as direct brokers from Amstar. While some rejected the offer, two general brokers, Kenneth Fox and George Waller, agreed to forego representation of other sugar refiners to act as sugar brokers exclusively for Amstar.[3] Amstar offered the terminated brokers a voluntary termination payment. The payments were made in exchange for general releases executed by the brokers. Thirteen brokers accepted the payments and executed releases. Only the plaintiffs, Fuchs and Prael, refused the payments and commenced this suit.

Plaintiffs charge that Amstar's decision to terminate its use of general brokers and to negotiate the sale of its product exclusively through direct brokers or its own sales personnel was the product of a conspiracy in restraint of trade. They charge that the terminations were part of a plan by Amstar to deprive its customers of the market information and competitive assistance supplied by the general brokers. This competitive assistance, plaintiffs argue, often enabled Amstar customers to purchase sugar at a price below that which Amstar had originally quoted. Plaintiffs conclude that the terminations were anti-competitive and in restraint of trade. In addition, plaintiffs contend that to implement successfully its new distribution system Amstar conspired with its own general and/or direct brokers. They cite as evidence of conspiracy that after the general brokers were notified of the terminations, two of them agreed to become direct brokers for Amstar and 13 former Amstar brokers acquiesced to their terminations by accepting the voluntary termination payments. Plaintiffs also focus on the fact that from 1972 to 1974, Fuchs agreed to act as one of two direct brokers on grocery sales in New York with the firm of Andorn, Bergida & Danks, Inc. ("ABD") for Amstar. After Fuchs' termination, however, ABD continued to represent Amstar as its only broker in New York, thus aiding Amstar in implementing its new distribution system.

■ Section 1 of the Sherman Act prohibits every contract, combination, or conspiracy in restraint of trade. Since a § 1 conspiracy, like other proscribed conspiracies, requires a plurality of actors, the contract, combination or conspiracy must reflect an agreement between independent businessmen. *Simpson v. Union Oil Co.*, 377 U.S. 13, 20, 84 S.Ct. 1051, 12 L.Ed.2d 98 (1964); *Bowen v. New York News, Inc.*, 522 F.2d 1242 (2d Cir. 1975), *cert. denied*, 425 U.S. 936, 96 S.Ct. 1667, 48 L.Ed.2d 177 (1976); *Modern Home Institute Inc. v. Hartford Accident & Indemnity Co.*, 513 F.2d 102, 108–09 (2d Cir. 1975).

2. It is evident that this "customer orientation" was the result of two factors. First, it was a function of the peculiar market position occupied by the general sugar brokers in simultaneously representing a number of refiners. This allowed the general broker to acquire detailed market information as to the supplies and list prices of each of the sugar refiners. The brokers were not timid about using this information for the benefit of their customers. Second, the fact that the brokers were compensated upon the volume of sugar they arranged for Amstar to sell rather than upon the price of the sale or the profit margin realized by Amstar

further added to their customer bent. Their only interest was to sell as much sugar in a given period as possible, even if this meant conducting themselves in such a fashion as to require their principals to lower their initial quotations to a customer.

3. None of the general brokers terminated by Amstar in March 1974 went out of business, and all continued to represent Amstar's competitors. Indeed, at the time of trial Fuchs represented 22 other suppliers and Prael represented 13.

■ The Sherman Act does not condemn every business decision as a § 1 conspiracy merely because it is the product of an agreement between two persons or entities legally capable of conspiring. A manufacturer may announce the terms under which he will market his product and deal only with those customers who agree to abide by the terms. *United States v. Colgate & Co.*, 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992 (1919). Similarly, a manufacturer is free to choose the type of mechanism through which he will distribute his goods and can designate certain sales representatives as his exclusive agents. *United States v. Arnold, Schwinn & Co.*, 388 U.S. 365, 376, 87 S.Ct. 1856, 18 L.Ed.2d 1249 (1967), overruled in part on the grounds, *Continental T.V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977); *Bowen v. New York News, Inc., supra*, 522 F.2d at 1254. *See also Knutson v. Daily Review, Inc.*, 548 F.2d 795, 804–05 (9th Cir. 1976), *cert. denied*, 433 U.S. 910, 97 S.Ct. 2977, 53 L.Ed.2d 1094 (1977). We have held that:

> "[w]here a manufacturer simply decides on his own to substitute one dealer for another, and cuts off the former dealer, his decision to sell exclusively to a new dealer does not amount to an antitrust 'conspiracy' with the latter, [citations omitted], even though the manufacturer has agreed with the new dealer to transfer patronage to him and to terminate sales to the former dealer." *Bowen v. New York News, Inc., supra*, 522 F.2d at 1254.

This is equally true where a manufacturer abandons his entire distribution system in favor of another system, *Knutson v. Daily Review, Inc., supra*, 548 F.2d at 805, whether it be to improve distribution, maximize profits or for some other legitimate competitive reason. *Oreck Corp. v. Whirlpool Corp.*, 579 F.2d 126 (2d Cir. 1978) (en banc) (Mansfield, J. dissenting on other grounds).

■ A § 1 conspiracy will arise, however, where in addition to substituting one distribution system for another the manufacturer attempts to exact some collateral anticompetitive advantage. *Bowen v. New York News, Inc., supra*, 522 F.2d at 1254. *See also Knutson v. Daily Review, Inc., supra*, 548 F.2d at 804–05. For example, in *Bowen* the defendant, the New York News, announced that it would no longer market its paper through independent dealers who in addition to distributing the defendant's paper were selling those of its competitors. Instead, the News decided to franchise certain dealers to whom it would sell exclusively. After announcing its decision the News offered its independent dealers the opportunity to become exclusive dealers. Some of the dealers agreed to become exclusive dealers while others rejected the offer and remained independent dealers. We held that this was simply a change by the News in its distribution system and, without more, would not constitute an antitrust conspiracy. As it developed, however, the independents were still able to buy copies of the News from independent sources and continued to service their customers. The News, however, in cooperation with some of its franchised dealers, attempted to cut off the independents' source of supply, thus eliminating them as competitors with its own franchised dealers. It was this concerted conduct which we held constituted a § 1 conspiracy.

■ Appellant's first attack upon the judgment below is that Amstar was incapable, as a matter of law, of conspiring with its own sugar brokers in restraint of trade.[4] Appellant argues that Amstar's sugar brokers were an instrumentality of the Amstar corporation and consequently were not in-

---

4. Although the Court below stated that Amstar did not contend that the general brokers (and presumably the direct brokers) were so lacking in independence that any conspiracy with them would have been intra-corporate (447 F.Supp. at 874 n. 10), the record indicates the contrary. Indeed, the essence of Amstar's argument below, and again on appeal to this Court, is that the general and/or direct brokers were merely a part of the Amstar entity rather than a separate step in the distribution chain. Amstar contends that the brokers were economically indistinguishable from Amstar and legally incapable of conspiring with Amstar in violation of § 1.

dependent entities with whom Amstar could conspire under § 1. Appellant points out that there is no evidence that Amstar did anything more than merely reorganize its distribution system and, as we announced in *Bowen*, this alone will not support a § 1 conspiracy. *Bowen v. New York News, Inc., supra,* 522 F.2d at 1254; *Oreck Corp. v. Whirlpool Corp.,* 579 F.2d at 126, 139 (2d Cir. 1978) (en banc) (Mansfield, J., dissenting on other grounds.) [5]

■ We hold that the evidence only supports the conclusion that Amstar acted unilaterally in arriving at its decision to change its distribution system and eliminate use of its general brokers. Indeed, the record is replete with evidence that the termination decision was a closely guarded secret within the Amstar corporation and in fact was the subject of elaborate security precautions. These included the designation of a single typist to prepare the paperwork necessary to notify the brokers of the terminations. Moreover, insofar as those co-conspirators proposed by plaintiffs are concerned, there was no evidence that any of these candidates either took part in the decision or even had any knowledge of the decision prior to the terminations. In fact, the only evidence in the record is to the contrary. Both of the former general brokers who later became direct brokers for Amstar testified that they took no part in the termination decision.

■ Likewise, following the terminations, the record is devoid of any evidence that Amstar conspired with anyone in restraint of trade. We find no merit in plaintiffs' argument that it was evidence of a § 1 conspiracy that after the terminations some former brokers agreed to become direct brokers for Amstar and others, by accepting the voluntary termination payments which were made to alleviate some of the loss and dislocation attributable to the brevity of the notice, agreed to end their relationship with Amstar. Indeed, if it is not an antitrust violation for a manufacturer to change his distribution system, then it can hardly be evidence of an illegal conspiracy that the manufacturer seeks merely to secure the personnel to man this new system. *Bowen v. New York News, Inc., supra,* 522 F.2d at 1254. Accordingly, Amstar's offering its former agents the opportunity to become part of its new distribution system and the decision of two agents to accept the opportunity was not evidence of a § 1 conspiracy. Similarly, the fact that the majority of its former agents decided to reject the opportunity and continue as general brokers for other refiners does not evidence a conspiracy.

■ The plaintiffs argue that in view of the Supreme Court's holding in *Albrecht v. Herald Co.,* 390 U.S. 145, 88 S.Ct. 869, 19 L.Ed.2d 998 (1968), the jury had sufficient evidence from which it could infer that Amstar's goal in terminating its general

---

**5.** Whether the two actors constitute distinct economic entities for purposes of the Sherman Act is determined by the economic realities of their relationship. *Knutson v. Daily Review, Inc., supra,* 548 F.2d at 801–02. In the context of the principal/agent relationship this analysis requires consideration of a number of elements which include: whether the agent performs a function on behalf of his principal other than securing an offer from a buyer for the principal's product; the degree to which the agent is authorized to exercise his discretion concerning the price and terms under which the principal's product is to be sold; and finally whether use of the agent constitutes a separate step in the vertical distribution of the principal's product.

Review of these elements in the case at bar indicates that Amstar's sugar brokers possessed none of the earmarks of an economic entity separate and distinct from Amstar. So

far as their relations with Amstar were concerned, it is clear that the sugar broker acted solely as the conduit through which Amstar would negotiate the initial distribution of its sugar. Thus, the brokers never purchased sugar from Amstar or competed with Amstar in the distribution or sale of sugar. Nor did Amstar ever hold the brokers out as its competitors. Their sole function was to supply Amstar with potential customers. The terms and price of a resultant sale were exclusively determined by Amstar. Accordingly, since the purchase of Amstar sugar through a broker was in all respects a purchase directly from Amstar, *see, e. g., Sugar Industry Antitrust Litigation,* 73 F.R.D. 322 n. 16 (E.D.Pa.1977), rather than representing a separate and independent step in the distribution process, the sugar broker was merely an agent.

brokers was anti-competitive and that the conduct of its general and/or direct brokers materially aided and abetted its accomplishment, thus permitting a finding that there was an illegal conspiracy. The trial court in submitting the § 1 claim to the jury and again in denying Amstar's motion for judgment n. o. v., adopted the plaintiffs' reasoning.[6] These rulings were erroneous.

In *Albrecht* the plaintiff was an independent newspaper carrier who purchased newspapers wholesale from the defendant, the Globe, and thereafter sold them at retail. The parties were operating pursuant to an exclusive territory arrangement which provided, in pertinent part, that if a carrier exceeded the maximum retail price advertised by defendant, his exclusive territory would be lost. In violation of this agreement the plaintiff began to sell its papers at a price above the maximum set by the defendant. Thereafter, defendant engaged the Milne Circulation Sales Corp. ("Milne") to solicit customers from within plaintiff's territory for delivery at defendant's maximum price. Eventually those customers wrested by Milne from within the plaintiff's territory, numbering about 300, were turned over to another independent carrier named Kroner. The Globe employed Kroner under the same maximum price agreement it had imposed upon the plaintiff. Moreover, Kroner knew that he might have to relinquish the 300 customers to the plaintiff when and if plaintiff ever decided to abide by the retail price standards set by the Globe.

Sometime later *plaintiff* was informed that his customers and exclusive territory would be returned if he agreed to abide by the retail price program. He refused and brought suit alleging a § 1 conspiracy. The Globe argued that its conduct in terminating the plaintiff was wholly unilateral and there could be no conspiracy as a matter of law. The Supreme Court disagreed.

In its decision, the Supreme Court held that a conspiracy arose between the Globe and Milne and/or Kroner which was calculated to coerce plaintiff's conformity with its program of retail price maintenance. Paramount in its decision was the fact that both Milne and Kroner knew of the Globe's scheme to enforce its program of retail price maintenance and that their conduct materially aided in the achievement of that objective. 390 U.S. at 150, 88 S.Ct. 869.

The *Albrecht* finding of an unlawful combination has been read in this circuit to apply only where there is evidence of knowing and active participation by a dealer and his manufacturer in a scheme to coerce compliance with anticompetitive activity such as resale price maintenance. *Bowen v. New York News, Inc., supra*, 522 F.2d at 1254; *Modern Home Institute, Inc. v. Hartford Accident & Indemnity Co., supra*, 513 F.2d at 113–14. *See also Knutson v. Daily Review, Inc., supra*, 548 F.2d at 804–05; *Tamaron Distributing Corp. v. Weiner*, 418 F.2d 137 (7th Cir. 1969).

In the case at bar, however, there is no claim that Amstar has engaged in any un-

---

**6.** ". . . so long as the jury in the instant case found an anticompetitive purpose, which they could have, they also could have found that Amstar combined with Kenneth L. Fox and George David Waller in pursuit of that purpose. Amstar knew that in order for its plan to succeed it would need to hire additional people to serve as either direct brokers or Amstar sales people. There was evidence that it expected at least one of these additional people to 'fall out' of the ranks of the terminated general brokers. Fox and Waller did not merely 'fall out', however. They were induced by Amstar to give up representing competing refiners, and they agreed to do so, knowing the nature of Amstar's dissatisfaction with the general sugar brokers and what would be expected of them

as direct sugar brokers. When Fox and Waller fell in line, they provided the experience Amstar required and thus materially aided and abetted the overall plan.

In addition, if the jury found an anti-competitive purpose in the elimination of general brokers with respect to New York City grocery accounts and the imposition of exclusive brokerage arrangements involving territorial and customer restrictions with Fuchs and ABD, under the *Albrecht* holding the jury could also have found that Amstar combined with ABD in order to reduce interbrand competition, stabilize prices, and eliminate general brokers servicing New York City grocery accounts. . . ." Memorandum Opinion on motion for j. n. o. v., reported at 447 F.Supp. 869, 874–875 (1978).

lawful resale price fixing with any of its brokers. Nor is there any evidence that Amstar, alone or in concert with others, sought by its terminations to coerce compliance by plaintiffs or any other brokers with anti-competitive activity. On the contrary, the record indicates that Amstar simply made a unilateral decision to change the method by which it markets its product. Accordingly *Albrecht* does not support the judgment of the district court.

There being no evidence that Amstar went beyond mere unilateral substitution of one method of distribution for another, we reverse the judgment below on the § 1 claim and dismiss the complaint.