DONALD B. RICE TIRE COMPANY, INC.

v.

MICHELIN TIRE CORPORATION.

Civ. No. Y–78–209.

United States District Court,
D. Maryland.

Jan. 30, 1980.

George W. Shaffer, William N. Rogers, Rockville, Md., Timothy J. Waters, and Robert H. Morse, Washington, D. C., for plaintiff.

James J. Bierbower, Bethesda, Md., Robert P. Knapp, Jr., and Raymond L. Herbert, New York City, for defendant.

JOSEPH H. YOUNG, District Judge.

Plaintiff Donald B. Rice Tire Company (Rice) sued the Michelin Tire Corporation (Michelin) for treble damages for alleged violations of 15 U.S.C. § 1 resulting from the termination of Rice's dealer relationship with Michelin. At trial, plaintiff sought to prove that defendant chose not to sign a

new annual dealer sales agreement because Rice failed to comply with various restraints which Rice contended were unlawful. The defendant sought to demonstrate that its decision to terminate Rice constituted unilateral action not within the scope of § 1, that it did not, in fact, impose the restraints alleged by the plaintiff, and that, in any case, the restraints were legal.

The evidence presented to the Court indicates that defendant's decision does not constitute unilateral action escaping scrutiny under § 1. In addition, the evidence shows that the nonrenewal decision was motivated, at least in part, by defendant's desire to impose various restraints upon its authorized dealers. Plaintiff failed to establish, however, that the overall effect of the contested restraints was anti-competitive and thus that they were unreasonable under *Continental T.V., Inc. v. GTE Sylvania,* 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977). Because this Court's decision turns in large part upon its assessment of the competitive effects of the nonrenewal decision, a brief review of the events leading up to the decision is in order.

*Factual Background*

The Donald B. Rice Tire Company is an independent tire dealer located in Frederick, Maryland, approximately forty miles from both Washington and Baltimore. The company was founded in 1955. During the late 1960's, Rice began to sell Michelin tires which it bought from an authorized dealer. In 1970, following discussions between Rice and Michelin, a dealer sales agreement (DSA) was signed. The DSA was for a period of a year and subsequent contracts were signed by the parties annually until 1977 when Rice was notified of the nonrenewal decision. During this seven-year period, plaintiff experienced very rapid growth. In 1970, Rice had sales of approximately $500,000, whereas by 1977, sales exceeded $10,000,000. A substantial part of this increase resulted from Rice's decision in 1973 to become a large-scale wholesaler of Michelin tires. The wholesale portion of plaintiff's business, which accounted for less than 25% of total sales in 1972, expanded to

the point that in 1977 it represented 80% of Rice's business. Plaintiff was particularly successful in its efforts to wholesale Michelin tires; by 1977, its volume of Michelin sales exceeded $4,000,000, making it one of the largest Michelin dealers in the country.

Rice took full advantage of discounts offered by Michelin on a per order and annual basis for large volume sales. Employment of this strategy enabled Rice to purchase Michelin tires 15% more cheaply than buyers who were not entitled to any discounts. Rice then wholesaled to smaller authorized dealers and to unauthorized Michelin dealers. Rice's rapid growth was accompanied by a corresponding expansion in the geographical area in which it competed. Whereas in 1972, Rice competed almost exclusively in the geographical area within 150 miles of Frederick, by 1977, approximately 20% of plaintiff's sales were outside the area consisting of Maryland and the states contiguous to it.

Throughout these proceedings, the defendant was much more reticent than the plaintiff in voluntarily revealing information pertaining to corporate organization, strategy, and sales volume. Nevertheless, testimony at trial established Michelin's successful penetration of the American tire market. Although Michelin had developed the steel-belted radial tire during the 1940's and had widely distributed it in Europe during the 1950's, the radial tire, the only type manufactured by Michelin, was not actively promoted in the United States until the latter half of the 1960's. The first significant step in this direction occurred in 1964 when Sears, Roebuck and Company began selling Michelin tires under its private Allstate label.

The next stage in Michelin's drive to penetrate the American market, according to the testimony of dealers and former Michelin employees, consisted of signing large, established dealers who assumed responsibility for introducing and distributing Michelin tires in their geographical areas. These large dealers retailed Michelin tires and also wholesaled them to "associate dealers." This method of distribution was in

part a result of a shortage of trained Michelin sales personnel.

Michelin followed this distribution method until the mid-1970's when it increased the number of authorized Michelin dealers and assumed a greater portion of the wholesaling function. Thus, the number of authorized dealers increased from 300 in 1969 to 2500 in 1977. The change in policy was also reflected in the DSA employed by Michelin. The DSA signed by the parties in 1973 provided that "Dealer may appoint one or more Associate Dealers . . . of good financial standing, business reputation and service capabilities . . . [and] shall notify Seller of every Associate Dealer appointment on a form specified and furnished by Seller." By 1975, this provision had been replaced by the following language: "It is understood that the right to appoint dealers in Michelin brand products is reserved to Seller and the privilege to deal in Michelin brand products is non-exclusive."

As plaintiff's success in wholesaling Michelin tires from 1973 through 1977 indicates, the defendant's attempts to integrate vertically were not entirely successful. Unauthorized dealers, as well as smaller Michelin dealers who could not qualify for the maximum quantity discounts, continued to buy from Rice and other dealers who wholesaled. In addition, even large dealers would buy Michelin tires from Rice when they were unavailable from Michelin. Finally, in late 1977 and early 1978, Michelin decided not to renew Rice and other authorized dealers who extensively and aggressively wholesaled Michelin tires. Although those nonrenewal decisions are not at issue in this case, the fact remains that they cast light upon the defendant's rationale in the instant dispute. The conclusion that the nonrenewal decision in this case was motivated in large part by Michelin's desire to assume primary responsibility for the wholesaling function is further bolstered by the deposition testimony of Gerard W. Boyle, the President of Englewood Tire Distributors, who stated that the defendant's decision not to renew his dealership agreement was revoked when he offered to terminate his wholesaling activities.

At trial, plaintiff presented evidence of two other forms of restraint imposed by Michelin upon its authorized dealers. First, the DSA contains a location clause limiting the effect of the agreement to the locations specified. This provision was enforced by Michelin's policy of shipping goods to designated locations. In addition, the evidence establishes, and defendant did not contest, that although dealers could pick up tires from the warehouse located in their geographical area, and thereby earn a rebate, they were not permitted to pick up tires from warehouses located elsewhere, even though Michelin would ship tires from nonlocal warehouses in the event of shortages. Plaintiff contended that these policies operated to impede its efforts to compete on a national scale. The economic rationales underlying these restraints as well as the evidence presented concerning the actual competitive consequences of the nonrenewal decision will be examined herein. This analysis is mandated by the Supreme Court's decision in *Sylvania,* which recognized that vertical restrictions might simultaneously suppress intrabrand competition while promoting interbrand competition. *See generally,* ABA Antitrust Section, Monograph No. 2, Vertical Restrictions Limiting Intrabrand Competition (1977).

*The Rice Nonrenewal Decision-Unilateral Action or Contract, Combination or Conspiracy in Restraint of Trade*

■ It is necessary to assess defendant's argument that the nonrenewal decision was a unilateral action not subject to scrutiny under 15 U.S.C. § 1 which proscribes "[e]very contract, combination . . . or conspiracy . . . in restraint of trade . . . .," before proceeding to an evaluation of the reasonableness of the restraints imposed by Michelin on its dealers. While a seller "may announce in advance the circumstances under which he will refuse to sell," *United States v. Colgate & Co.,* 250 U.S. 300, 307, 39 S.Ct. 465, 468, 63 L.Ed. 992 (1919), it is not necessary for this Court to find an express or implied contract to con-

clude that defendant's conduct cannot be characterized as purely unilateral. *United States v. Parke, Davis & Co.*, 362 U.S. 29, 80 S.Ct. 503, 4 L.Ed.2d 505 (1960). Testimony at trial reveals the requisite degree of involvement of other parties.

Jean Pierre Duleyrie, the Vice-President in charge of sales, and the individual primarily responsible for the nonrenewal decision conceded that complaints from Michelin sales personnel in other areas and from other tire dealers about plaintiff's geographically extensive and large-scale wholesaling activities contributed to the decision. While Michelin sales personnel do not qualify as economically distinct entities with whom defendant could conspire or contract, *Fuchs Sugars & Syrups, Inc. v. Amstar Corp.*, 602 F.2d 1025 (2d Cir. 1979), other Michelin tire dealers do qualify. Numerous other witnesses testified that other tire dealers complained to Michelin personnel about plaintiff's activities. In light of this testimony, as well as Duleyrie's concession that no other types of complaints from any sources about any other aspects of plaintiff's business were received prior to the nonrenewal decision, it is apparent that a combination existed for the purposes of § 1 between Michelin and some of its authorized dealers.

*Is The Restraint Horizontal or Vertical*

■ Application of the rule of reason standard presupposes that the restraints are vertical. Plaintiff's argument that the restraints should be characterized as horizontal would require a finding that the restraints are illegal because horizontal restraints are illegal *per se*. *United States v. General Motors Corp.*, 384 U.S. 127, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1966); and *United States v. Topco Associates*, 405 U.S. 596, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972). In support of its contention, plaintiff points to the fact that the parties compete at the wholesale level.

■ The Supreme Court's decision in *United States v. Arnold, Schwinn & Co.*, 388 U.S. 365, 372, 87 S.Ct. 1856, 18 L.Ed.2d 1249 (1967) (overruled on other grounds by *Sylvania, supra* ), suggests that in a dual distribution system where the manufacturer is both supplier and competitor, the restraints imposed are to be evaluated as vertical because "[t]he source of the restrictions is the manufacturer." Some lower courts, however, have rejected this approach in favor of a functional analysis directed at the impetus, purpose, and effect of the restrictions. *See, e. g., Dougherty v. Continental Oil Co.*, 579 F.2d 954 (5th Cir. 1978); *Rubbermaid, Inc. v. F.T.C.*, 575 F.2d 1169 (6th Cir. 1978); *H & B Equipment Co. v. International Harvester Co.*, 577 F.2d 239 (5th Cir. 1978). This Court rejects the latter approach for a number of reasons. First, the Supreme Court's decision in *Sylvania* clearly indicates that "*[p]er se* rules of illegality are appropriate only when they relate to conduct that is manifestly anticompetitive." 433 U.S. at 50, 97 S.Ct. at 2557. Given that the Court in *Sylvania* acknowledged that restraints imposed by manufacturers on sellers may benefit interbrand competition, application of a *per se* rule which does not take those benefits into account, merely because the parties are also competitors, appears to be inappropriate. A more extended functional analysis to determine whether the restraint should be characterized as horizontal or vertical, on the other hand, would merely duplicate some of the necessary steps in the rule of reason analysis because the vertical restraints least likely to promote interbrand competition are those which are the functional equivalent of horizontal dealer cartels in which the impetus for the restraint is the dealers' interest in higher prices rather than the manufacturer's interest in a more efficient distribution system. Posner, Antitrust Policy and the Supreme Court: An Analysis of the Restricted Distribution, Horizontal Merger and Potential Competition Decisions, 75 Colum.L.Rev. 282, 298 (1975); *Fuchs Sugars, supra*, 602 F.2d at 1030; *Oreck Corp. v. Whirlpool Corp.*, 579 F.2d 126 (2d Cir. 1978). Therefore, a more sensible approach incorporates the horizontal/vertical inquiry into the application of the rule of reason.

## Defining the Relevant Market

The relevant market must be defined in order to evaluate the competitive consequences of the restraints at issue in this case. *Gough v. Rossmoor Corp.*, 585 F.2d 381 (9th Cir. 1979). Although the parties have suggested numerous variables bearing on market definition, the task is quite burdensome in the context of this case.

■ The inquiry will be simplified by articulating at the outset the types of variables that are relevant to market definition. First, it should be noted that the relevant geographic and product markets are defined primarily with reference to cross-elasticity of demand. *Neugebauer v. A. S. Abell Co.*, 474 F.Supp. 1053 (D.Md.1979) (citing *United States v. E. I. duPont de Nemours*, 351 U.S. 377, 76 S.Ct. 994, 100 L.Ed. 1264 (1956)). Defendant's expert witness, Dr. Peter D. Linneman also pointed out that cross-elasticity of supply plays a role in defining the product market. Areeda and Turner, Antitrust Law, Vol. II, 374–376 (1978); *Brown Shoe Co. v. United States*, 370 U.S. 294, 325–26, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962). In this connection, he suggested that factors such as common inputs and the ease with which a manufacturer could shift the geographical or product focus of his activities were relevant to market definition.

■ There is a wide range of possible parameters relating to definition of the product market: brand; use (truck, earth mover, and passenger car tires); construction (radial vs. non-radial); application (original equipment vs. replacement); and newness (new vs. retread). The parties agreed that the product market should be divided according to use and plaintiff contended that Michelin tires should be considered a separate market. Although the evidence clearly established that Michelin is a premium tire with a reputation for durability and safety, these attributes are insufficient under the functional interchangeability test that serves as a proxy for cross-elasticity of demand, to justify such a narrow product market definition. *Neugebauer, supra.*

■ Defendant's contention that the original equipment and replacement markets should be grouped together is more problematic. As Dr. Linneman suggested, producers can easily shift their activities in these two areas in response to price changes. Customers, however, do not buy vehicles to obtain tires. Therefore, at first glance, there is high cross-elasticity of supply but not of demand. This conclusion rests on the assumption that motor vehicle manufacturers and dealers and vehicle owners are not buyers in the same market. Upon reflection, however, it is necessary to reject this premise in light of the fact that all of these buyers are competing for access to the same products. An increase in demand for tires by automobile manufacturers for example would result in higher prices being charged to both manufacturers and vehicle owners.

More difficult problems of definition are presented by the remaining variables. Initially, it would seem that radial and non-radial tires should be included in the same product market. Much less superficially similar products have been so grouped. In *duPont, supra,* for example, the Supreme Court rejected the contention that the correct product market was cellophane and held that all flexible wrapping materials should be included. 351 U.S. at 400, 76 S.Ct. at 994. In the replacement tire market, however, radials and non-radials, despite their superficial similarity, are not feasible substitutes unless the customer is replacing all of the tires on his vehicle because consumers are advised that safety reasons militate against mixing radials and non-radials. The conclusion that radials and non-radials are not in the same product market is bolstered by evidence of very significant price differentials between the two types of tires. A 1977 Modern Tire Dealer survey indicated that the median price for bias tires was between $30 and $35 and that bias belted tires averaged $5 more. The median price for radial tires, on the other hand was between $60 and $65. This conclusion is also bolstered by the testimony of the plaintiff's expert witness, Dr. Robert

George Cox. Dr. Cox stated that it is difficult to transform plants for the manufacturing of bias and bias-belted tires into facilities for the production of radial tires.

The evidence relevant to new and retread tires also indicates a substantial price differential. Moreover, the production facilities for the two products are totally distinct. Testimony established, however, that there was high cross-elasticity of demand between these two types of products, particularly in the truck tire market. Manufacturers compete on the basis of how many times their radial tires can be retreaded. Numerous tire dealers testified that truck fleet owners were extremely sophisticated buyers who compared tires on the basis of cost per mile. Given this fact, as well as the fact that new and retreaded tires are functionally interchangeable, it follows that new and retread truck tires are in the same product market. Although automobile owners are presumably less expert tire buyers, there is no reason to think that the availability of retreads as a substitute for new tires does not also affect prices charged for new radial tires.

■ The evidence relevant to definition of the appropriate geographical market suggests that the Baltimore-Washington metropolitan area is the proper benchmark. Areeda and Turner, *supra*, Vol. II at 358, state the general proposition that "[t]wo areas are ordinarily separate markets where there are no or only episodic sales between them and where transport costs exceed any price differentials between the two areas." In this case, the tire dealers who testified, including plaintiff, indicated that the great bulk of their business was in the immediate metropolitan area and that transportation costs generally prevented sales in other areas even where a price differential might exist. The barrier presented by transportation costs is underlined by plaintiff's desire to "drop-ship" tires to distant customers rather than to ship them from plaintiff's establishment in Maryland. The other factors outlined by Areeda and Turner, *supra*, Vol. II at 367, that bear on the definition of the geographical market also support this

conclusion. First, "[f]or some products . . . the availability of immediate servicing is of critical importance, and consumers will not buy the product unless immediate servicing is readily available. For other products, the immediate availability of the product itself is important and local distribution facilities are essential to successful marketing. And where consumer goods . . . are concerned, heavy initial promotional expenditures may be necessary successfully to penetrate a particular geographic area . . . ." Thus, the necessity of providing point-of-sale services precludes rapid shifts in supply in response to price changes. This appears to be true in the tire industry. As noted further herein, promotion and service are essential to the efficient marketing of tires.

*The Reasonableness of the Restraint*

■ The Court in *Sylvania* recognized a number of types of marketing efficiencies that might result from the manufacturer's imposition of vertical restraints. It pointed out that entrants into a market might use such restrictions "to induce competent and aggressive retailers to make the kind of investment of capital and labor that is often required in the distribution of products unknown to the consumer." In addition, "[e]stablished manufacturers can use [such restraints] to induce retailers to engage in promotional activities or to provide service and repair facilities necessary to the efficient marketing of their products." 433 U.S. at 55, 97 S.Ct. at 2560. Also, the Court noted that developments in products liability law result in greater "demands that manufacturers assume direct responsibility for the safety and quality of their products." *Id.* at n. 23. At trial, defendant introduced evidence in support of its contention that the restraints at issue in this case can be justified on all of the grounds enumerated above, thus contesting the plaintiff's evidence that the reasons given were pretextual. As the following review of the evidence will demonstrate, although the first and third contentions are without factual basis, the second contention is supported by the evidence.

### The New Entrant Rationale

The evidence introduced by defendant on this point established that it is a relatively new entrant into a highly concentrated market with a relatively small market share. Other evidence established, however, that the restraints on intraband competition were not necessary to induce retailers to carry and promote the Michelin product. First, the evidence suggested that Michelin, as a result of its introduction of the radial tire, and its apparently well-deserved reputation for quality workmanship, had no difficulties finding dealers for its products. On the contrary, several dealers testified as to their difficulties in obtaining a DSA. Testimony of dealers and Michelin sales personnel established that there were frequently shortages of Michelin tires. These facts militate against the need for offering incentives to dealers to obtain aggressive sales personnel at the retail level. In any case, the Court is skeptical of the validity of this rationale for permitting vertical restraints. As one commentator has suggested, vertical restraints imposed by the manufacturer to attract distributors may be indistinguishable from restraints imposed to implement a dealer cartel. *See* Pitofsky, The *Sylvania* Case: Antitrust Analysis of Non-Price Vertical Restrictions, 78 Colum.L.Rev. 1, 19 (1978). Because dealer cartels are horizontal restraints, subject to *per se* prohibition, their functional equivalents should be strictly evaluated.

### The Free-Rider Rationale

The main thrust of defendant's case was to bring it within the second justification for vertical restraints suggested above. Its evidence established that plaintiff did not bear its fair share of the costs of promoting and servicing Michelin tires. The customer restrictions imposed by Michelin in deciding not to renew those dealers who wholesaled extensively, thereby threatening remaining dealers who might contemplate such a sales strategy, were shown to be necessary to prevent free-riding by retailers on the services provided by other dealers. Failure to impose such sanctions would induce dealers to decrease the amount of services offered in order not to be undersold by free-riding dealers. Eventually, "these services might not be provided by retailers . . . despite the fact that each retailer's benefit would be greater if all provided the services than if none did." 433 U.S. at 55, 97 S.Ct. at 2560.

### Free-Riding on the Promotional Efforts of Michelin and Other Dealers

Plaintiff was one of the largest Michelin dealers in the country. Its promotional efforts, however, consisted of advertising in the local newspaper and on radio, and in supplying some promotional materials and information to the dealers to whom it sold. Given this fact, as well as Kenneth Rice's testimony that he wholesaled tires because of the low level of cost involved, it appears that the level of advertising expenditures was not consummate with the sales volume. The evidence suggested a number of ways in which plaintiff was free-riding on the promotional efforts of others.

One of the reasons given by the defendant for the nonrenewal decision was plaintiff's failure to have a Michelin sign outside his business premises. In light of the fact that other dealers did not have signs, that a previous sign had to be removed at the insistence of the local zoning authorities, and that plaintiff had offered to erect a sign on adjacent property, this reason does not appear significant. This conclusion is bolstered by the testimony of Michelin's sales personnel that the lack of a sign was not in itself a sufficiently serious matter justifying nonrenewal.

Of greater concern are the plaintiff's sales to unauthorized Michelin dealers. These dealers, unlike those operating under a DSA were not contractually obligated to "vigorously and aggressively promote the retail sale of Michelin Products." Rather, they were free to reap the benefits of increased demand for Michelin tires generated by the promotional efforts of authorized dealers. Michelin could have reasonably concluded that its authorized dealers would be unwilling to engage in the efficient amount of promotion lest they be undersold by unauthorized dealers, as evidenced by

the fact that Michelin's advantage in the radial market stemming from its pioneering role and reputation for quality was apparently declining as other major tire manufacturers developed radial tires of comparable quality and price that were rapidly gaining acceptance. The need for Michelin to respond to this increased competition from other radial tire manufacturers by expanded promotional efforts is underscored by the testimony of Thomas Pumpelly, president of National Tire Wholesalers to the effect that Michelin has recently changed its discount policy so that quantity discounts are conditioned on dealers spending 3% on advertising.

■ The fact that Michelin has changed its discount policy to directly require a certain level of expenditures from retailers desiring quantity discounts raises questions concerning the possible overbreadth of the means used to remedy plaintiff's free-riding. Application of the rule of reason does require an inquiry into whether the restraint is "reasonably necessary." *Newbury v. Washington Post Co.*, 438 F.Supp. 470 (D.D.C.1977); *Eiberger v. Sony Corp.*, 459 F.Supp. 1276, 1282 (S.D.N.Y.1978). Pitofsky, *supra*, suggests that such scrutiny is useful to illuminate the true purpose of a restriction. A poor fit between means and ends suggests that the avowed purpose is merely a pretext. Given the fact that plaintiff did not restrict his wholesaling efforts to the immediate geographical market, it cannot be said that the means used were not reasonably necessary. Requiring the plaintiff to spend the specified amount for advertising to qualify for the quantity discount might be ineffective if the promotional efforts and the retail sales were not in the same geographical market, or even if the promotional efforts were merely undertaken by a dealer other than the ultimate retailer of the tire.

### Free-Riding on the Services Provided by Other Authorized Dealers

Defendant introduced evidence concerning the important role of service in marketing Michelin tires. Duleyrie testified that service was especially important in the truck tire market. Proper selection of tires for truck fleets depends on the size of the tire, choice of ply rating, variance in the loads to be carried, and the speeds at which, and road surfaces upon which, the truck would be driven. He also stated that repairing and retreading services were important. Dr. Ira Robert Ehrlich, the defendant's expert witness in the field of tire engineering also asserted that service of Michelin tires required specialized knowledge. Tire selection, according to Dr. Ehrlich, also depends on the types of tube and rim involved. In addition, different brands of tires have different inflation specifications. Alexander Jankowsky, the national truck tire sales manager for Michelin, testified that Michelin recommended different methods of repairing and retreading from those endorsed by other manufacturers. Michelin also differed in its recommendations concerning balancing methods and use of sealants. From this evidence, the Court concludes that Michelin had a legitimate interest in ensuring that tires were sold by dealers who could provide these specialized services. This conclusion is buttressed by the provision in the DSA requiring that the dealer "render prompt, workmanlike and courteous service with respect to Michelin Products including all services to which a purchaser of a Michelin Product from any authorized Michelin source may be entitled." Several dealers testified that they had difficulty obtaining DSA's as a result of their lack of service facilities.

At trial, defendant attempted to show that plaintiff's own service facilities were inadequate. This attempt failed in light of the unanimity of opinion among witnesses for both parties that plaintiff's service facilities were adequate, and that no complaints have ever been received concerning services rendered. The evidence with respect to plaintiff's facilities did establish that the volume of services performed was not commensurate with the volume of Michelin tires sold by plaintiff. This fact was conceded to be a function of plaintiff's wholesaling activities.

Several cases have recognized the manufacturer's legitimate interest in ensuring the provision of point-of-sale services. *See, e. g., Golden Gate Acceptance Corp. v. General Motors,* 597 F.2d 676 (9th Cir. 1979); and *Eiberger, supra.* The economic argument, as outlined in Posner, *supra,* at 283–85, is that if manufacturers are not permitted to impose vertical restraints which have the effect of stimulating point-of-sales services, dealers will not provide these services lest they be undercut by dealers not providing services. The problem is particularly acute in markets wherein it is difficult to prevent customers from obtaining services at one location while purchasing products from another outlet that does not offer the services but does offer lower prices.

The evidence at trial established that plaintiff's sales to unauthorized dealers were creating such problems. Duleyrie testified of an instance in which a truck fleet owner (user) had purchased Michelin tires from an unauthorized dealer. This user had not received the proper assistance in selection and application of the tires. Although the tires were not defective, Michelin had to make commercial concessions to avoid losing the account. Although Duleyrie conceded that the tires in question were not traced to Rice, it is reasonable to conclude that Rice's wholesaling activities created the risk that this type of problem would occur.

As the DSA indicates, Michelin dealers are obligated to service Michelin tires. Customers who bought Michelin tires from unauthorized dealers who were not so obligated presumably went to authorized dealers to obtain service. Brent Rigby, who formerly served as district manager for the Baltimore district, testified that dealers resent having to service tires that they did not sell. This fact was conceded by a number of tire dealers and suggests that the free-rider problem set out earlier existed and that Michelin reasonably could have determined that nonrenewal of major wholesalers was necessary to ensure provision of point-of-sale services.

Robert M. Johnson, Vice President of Rice, testified that the company took care of adjustments for defective tires sold to other dealers and indicated that Michelin's sales representative had classified Rice's number of adjustments as average. However, this does not prove that customers were, or were not, receiving adequate assistance in selection, application, maintenance and repair for tires purchased from unauthorized dealers who had purchased from Rice. Plaintiff's reliance upon Michelin's policy of tolerating wholesaling to small dealers is also misplaced. This policy probably resulted from a realization that such wholesaling was a universal practice. Michelin, with good reason, could have concluded that the costs of enforcing a ban on such wholesaling exceeded any gain to be derived from enforcement. Although some courts have strictly scrutinized the means employed by a manufacturer to achieve an admittedly legitimate objective, *see, e. g., Eiberger, supra,* the Court should not second-guess a manufacturer's choice from a range of alternative strategies.

The other evidence introduced by plaintiff to show that the service rationale was a pretext was the testimony of one dealer that the local Michelin sales representative suggested that he establish a sham retail operation in order to maintain his wholesale business in Michelin tires. This evidence, however, does not undermine the Court's conclusion that Michelin management was concerned about the services received by purchasers of its products. Sales personnel employed by Michelin earned commissions on tires sold to dealers in their areas. This arrangement clearly resulted in such personnel adopting a protective attitude towards the authorized dealers in their areas and was also responsible for the fact that sales personnel had a disincentive to report any inadequacies in the services offered by dealers in their area. This fact supports the necessity of Michelin management taking steps to ensure provision of point-of-sale services.

*Territorial Restrictions*

At trial, plaintiff introduced evidence that Michelin imposed territorial as

well as customer restrictions on its authorized dealers. These territorial restrictions took the form of location clauses in the DSA and in the institution of a warehouse policy. Testimony established that the location clause was designed to ensure that authorized dealers only sold Michelin tires at locations at which they could provide services. The warehouse policy in effect barred dealers from picking up tires at warehouses not located in their district. They were permitted to pick up tires at the local warehouse and thereby earn a discount. In addition, if tires were unavailable at the local warehouse, Michelin would ship the tires to the dealer. Dr. Linneman suggested a persuasive economic rationale for this practice. Michelin presumably warehoused tires at the various regional warehouses in accordance with its forecasts concerning anticipated demand for Michelin tires in the area. Permitting dealers to pick up tires from any warehouse would make such planning more expensive. Dr. Linneman did concede, however, that the rationale underlying this policy did not apply when the customer was located in the district served by the warehouse, as its needs were presumably taken into account in supplying inventory for that warehouse. In evaluating the legality of this particular restraint, the Court is aware that "the fact that no competitive benefits are advanced in favor of a restraint . . . does not automatically constitute it unreasonable . . . ." *Gough v. Rossmoor Corp.,* 585 F.2d 381 (9th Cir. 1979). The plaintiff has the burden of establishing that the restraint actually harmed competition. The actual competitive consequences of the restraints at issue will be evaluated herein. First, however, the safety rationale must be considered.

### The Safety Rationale

Duleyrie testified that one of the reasons behind plaintiff's nonrenewal was the fact that only 4% of the registration cards required by the Department of Transportation had been filed with Michelin for tires sold by Michelin to Rice. The validity of this rationale is undercut, however, by the fact that defendant had received no complaints concerning Rice's handling of the DOT cards. More importantly, numerous witnesses including Edward H. Wallace, the former Chief of the Tire Division at DOT, testified that he wrote the specifications for the registration program and that the wholesaler's duty was to supply the cards to the retailer and that it was the retailer's responsibility to submit them to the manufacturer when the tire was sold to the ultimate consumer. Kenneth Rice testified that he complied with his obligation as a wholesaler. The defendant offered no evidence to rebut this testimony. Therefore, the Court concludes that despite the fact that there is precedent for upholding vertical restrictions designed to promote safety, *Tripoli Co. v. Wella Corp.,* 425 F.2d 932 (3rd Cir. 1970), this case does not fall within that rationale.

### Effects of the Restraints on Intrabrand and Interbrand Competition

The benefits to interbrand competition expected to result from the vertical restraints imposed by Michelin upon its dealers have been discussed. However, the rule of reason standard requires an assessment of the potential detriment to intrabrand competition of the challenged restraints.

Several authors have suggested a structural approach to this problem. See Louis, Vertical Distribution Restraints After *Sylvania*: A Postscript and Comment, 76 Mich.L.Rev. 265 (1977) and Pitofsky, *supra.* Generally, the greater the interbrand competition, the less effective vertical restraints will be in limiting intrabrand competition because dealers in a very competitive industry are constrained by competition from sellers of other brands. *Cf. H & B Equipment Co. v. International Harvester Co.,* 577 F.2d 239 (5th Cir.1978). In addition, the greater the degree of product differentiation, the greater the potential for restriction of intrabrand competition. *See, e. g., Westman Commission Co. v. Hobart Corp.,* 461 F.Supp. 627 (D.Colo.1978). Finally, under most circumstances, the manufacturer will have an interest in maintaining intrabrand competition because dealer com-

petition in price and services should increase demand for the manufacturer's product.

■ As stated above, this Court has reached the conclusion that the appropriate product markets are the radial car tire market, the radial truck tire market, and the radial off-the-road vehicle tire market. In each case, the original equipment and retread segments of the market are included. Although the Court concluded that the relevant geographic market is the Baltimore-Washington metropolitan area, it must rely upon figures pertaining to national market share as they are the only available figures. Dr. Linneman testified that Michelin's share of the radial passenger tire market was 7.9% in 1977, the year of plaintiff's nonrenewal. Michelin's share of the radial truck tire market was more difficult for the experts to calculate as less detailed information was available. Dr. Cox testified, however, that he estimated Michelin's share of that market was approximately 20 to 25%. No figures were available for off-the-road tires, but that market was not the primary focus of the case. Needless to say, the parties' experts disagree as to whether Michelin's market share was large enough to give it market power. An examination of the other variables bearing on this question indicates that it was not.

Market power is defined as the ability of a producer to raise and sustain prices above the competitive market. Only a firm with market power can effectively restrain competition. While Michelin may have had such power in the late 1960's when it was the sole supplier of radial tires, the presence of larger producers of radial tires of comparable quality and price negates the inference that this was the case in 1977. The conclusion that Michelin lacked the requisite market power to restrain competition is supported by the testimony of numerous witnesses that competition in the industry was fierce, and by the lack of anything other than impressionistic evidence to support plaintiff's contention that Michelin was able to charge consistently higher prices for its products. Rather, Dr. Linneman's study

of advertised passenger car tire prices in the Baltimore-Washington area established that during the latter half of the 1970's Michelin advertised prices declined in relation to those of other manufacturers, and were in fact lower than those of at least one of its competitors. In addition, the study showed advertised Michelin prices falling in real dollar terms during the period following plaintiff's nonrenewal. In fact, these downward trends accelerated after plaintiff's nonrenewal.

Although a similar study in the truck tire area would have been useful, as that was the market in which Michelin had a greater market share, the fact remains that plaintiff did not introduce any evidence to establish that this price study did not accurately reflect the realities of the market. Plaintiff failed to meet its burden of establishing that the defendant's actions had anticompetitive consequences.

The plaintiff's explanation of the rationale underlying defendant's conduct is open to question on other grounds. Plaintiff suggested that defendant was motivated by a desire to eliminate plaintiff as a competitor at the wholesale stage of distribution but did not offer any convincing explanation of why defendant would not prefer to utilize plaintiff's services if plaintiff was in fact a more efficient wholesaler. Presumably, lower wholesale costs would lead to great demand for Michelin products and higher profits. Plaintiff's explanation is also not credible in light of the significant steps taken by defendant to increase intrabrand competition. The evidence established that Michelin deliberately expanded the number of retail outlets authorized to carry its products. Although it may be possible for a manufacturer to restrict intrabrand competition to protect existing dealers, *see, e. g., Westman Commission, supra,* this motivation was not at work in this case. Not only did Michelin increase the number of outlets, numerous dealers testified that Michelin had taken deliberate action to dismantle the system of exclusive geographic territories it had established during the 1960's. Thus, the vertical restraints im-

posed by Michelin were reasonably necessary to meet the fierce competition from other producers of radial tires and the plaintiff failed to show that Michelin's change in distribution strategies had adverse impacts on intrabrand competition.

The findings of fact and conclusions of law stated herein are in accordance with the provisions of Rule 52, F.R.Civ.P. whether or not specifically stated.

Accordingly, for the reasons stated herein, it is this 30th day of January, 1980, by the United States District Court for the District of Maryland, ORDERED: that Judgment BE, and the same is, hereby entered in favor of the defendant.